[Cite as *Stachura v. Toledo*, 2022-Ohio-345.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

Capt. Carla Stachura, et al.                    Court of Appeals No.  L-19-1269

    Appellant                             Trial Court No.  CI0201503463

v.

City of Toledo, et al.                          **DECISION AND JUDGMENT**

    Appellees                             Decided:  February 7, 2022

* * * * *

Terry J. Lodge, for appellant.

Dale R. Emch, Director of Law, Jeffrey B. Charles, Chief of
Litigation, and Merritt W. Green, III, Senior Attorney, for appellees.

* * * * *

**OSOWIK, J.**

{¶ 1} Appellant, Carla Stachura, appeals the judgment of the Lucas County Court

of Common Pleas recognizing the jury verdict in favor of appellee, the city of Toledo, on

appellant's claims for gender discrimination and retaliation.  For the reasons that follow,

we reverse.

## I. Facts and Procedural Background

{¶ 2} This case has an exceptionally long litigation history. The complaint was originally filed in case No. CI-0200506445 on November 21, 2005, on behalf of appellant, and against defendants the city of Toledo, Fire Chief Michael Bell, Deputy Fire Chief John Coleman, and Deputy Fire Chief Robert Metzger.[1] The complaint alleged one count of gender discrimination, and one count of a tortious violation of constitutional rights.

{¶ 3} On October 15, 2007, the trial court granted summary judgment to the defendants on appellant's claims. However, in *Stachura v. Toledo*, 177 Ohio App.3d 481, 2008-Ohio-3581, 895 N.E.2d 202 (6th Dist.) ("*Stachura I*"), we reversed the award of summary judgment and remanded the matter for further proceedings.

{¶ 4} Upon remand, appellant filed an amended complaint that named Fire Chief Michael Wolever as an additional defendant. Furthermore, the amended complaint removed the claim for tortious violation of constitutional rights, and replaced it with a claim for retaliation.

{¶ 5} Thereafter, the individual defendants, Bell, Coleman, Metzger, and Wolever, moved for partial summary judgment on the basis of qualified immunity. The trial court

---

[1] Throughout the litigation, appellant was joined by plaintiffs Firefighter Geraldine McCalland and Firefighter Judy Imhoff. McCalland settled her claims during the trial, and Imhoff received a favorable verdict from the jury, and thus neither of them are part of this appeal. Accordingly, we will limit our discussion of the facts to those pertaining to appellant.

2.

denied the defendants' motion on February 24, 2012, and the defendants appealed. In *Stachura v. Toledo*, 6th Dist. Lucas No. L-12-1068, 2013-Ohio-2365 ("*Stachura II*"), we affirmed the judgment of the trial court, and remanded the matter for further proceedings.

{¶ 6} On July 24, 2015, the case was dismissed pursuant to Civ.R. 41 and refiled under case No. CI-0201503463. The refiled complaint contained an additional allegation of retaliation based upon events that had occurred since the filing of the prior complaint. On December 2, 2016, the trial court once again denied motions for partial summary judgment on the basis of qualified immunity filed by the city of Toledo, Bell, Coleman, and Metzger. In *Stachura v. Toledo*, 6th Dist. Lucas Nos. L-16-1310, L-16-1315, L-16-1316, 2017-Ohio-8772 ("*Stachura III*"), we affirmed the judgment of the trial court, and remanded the matter for further proceedings.

{¶ 7} A jury trial commenced on April 22, 2019. However, several days later, the trial was ended and the jurors were released from their duty due to a medical emergency. Ultimately, the matter proceeded to a two-week jury trial beginning on October 3, 2019.

{¶ 8} Appellant testified as the first witness. Appellant testified that she began her career as a firefighter on July 16, 1993. At the time, appellant was one of only 12 women out of a total of 525 people at the fire department. In 1997, appellant was promoted to Lieutenant. In June 2000, she was promoted to Captain. Then, in February 2002, appellant was designated the long-term Acting Battalion Chief in the Fire Prevention Bureau, a position which she held until June 2002.

3.

{¶ 9} For the sake of clarity, we will describe appellant's testimony in chronological order.

{¶ 10} Appellant testified that her first negative encounter with Deputy Chief Coleman was in November 1997. Appellant was taking a course in advanced fire tactics and command, and Coleman was her instructor. After a class, Coleman and appellant discussed some issues that appellant was having with some of her subordinate firefighters as it related to the course topics. Coleman, who was in appellant's chain of command, informed her that it was a confidential conversation. When appellant was done explaining the issues, Coleman responded by saying that men do not like taking orders from women to whom they are attracted. Appellant then testified that Coleman, despite his promise of confidentiality, contacted the other firefighters and told them to watch their back because of appellant.

{¶ 11} Next, appellant attempted to testify about another incident where Coleman did not treat her fairly, as it related to an anonymous letter that she received. The anonymous letter was identified as Exhibit 94. Upon the objection of the defendants, the trial court precluded appellant from entering the exhibit into evidence. Furthermore, the trial court prohibited appellant from any testimony regarding the anonymous letter, or what actions she took upon receiving the letter. Appellant proffered that her testimony would have been that Coleman knew who the author of the anonymous letter was, and that Coleman deliberately did not report the incident or refer the author for discipline

4.

until after the author had been safely promoted. Appellant argued that because the author was a male, Coleman's conduct was evidence of how Coleman protects malfeasant male officers.

{¶ 12} Appellant then testified that on January 22, 1999, she scored first on the Captain's exam. The next day, Coleman called her and told her that he was switching her shift from "B" shift to "C" shift. Appellant testified that the change in shifts was contrary to the collective bargaining agreement because she was not the lowest in seniority. Appellant was reticent to change shifts because there were some people on that shift that had participated in harassing her co-plaintiff, Judy Imhoff. Coleman, however, told her not to file a grievance over the change, stating that it would negatively impact her career prospects. Ultimately, appellant did not file a grievance.

{¶ 13} Another incident involving Coleman also occurred in 1999. In that incident, appellant was not feeling well, but decided to report for work anyway, thinking that she might feel better as the day went along. On that day, appellant was working at a station that had both an engine and a truck. Appellant testified that she was one of two lieutenants working at the station, and that she had more seniority, which according to an unwritten policy permitted her to have her choice of whether she would be assigned to the engine or to the truck. Appellant testified that the schedule that was made the day before had assigned her to the engine. However, she preferred working on the truck, so she chose to be on the truck. Appellant testified that the other lieutenant was angered by

this, and reported the matter to Battalion Chief Keating. After discussing the matter with Keating, appellant complied and stayed on the engine. Later that morning, appellant was still not feeling well, so she called the Chief and informed him that she was going to go home sick, which was a rare occurrence for her.

{¶ 14} Two weeks later, appellant and her crew were called over the departmental radio system to respond to headquarters. When appellant arrived, Coleman brought her into his office and accused her of feigning illness, and threatened to put a disciplinary report in her file. Appellant testified that a disciplinary report would have jeopardized her promotion to Captain. Appellant recounted that Coleman told her that she was in a "damned if you do, damned if you don't situation being a woman." Ultimately, appellant was not disciplined as a result of the incident. But, appellant did request to know how many people would be called downtown on an allegation of sick time abuse for going home one time. She also asked for clarification of the seniority policy, and for an explanation why Keating was allowed to bump the matter up to Coleman's level without first addressing his concerns with appellant directly. Appellant did not receive a response to any of her requests. Appellant testified that the whole encounter made her feel terrible, embarrassed, and humiliated because of how publicly it was conducted.

{¶ 15} Two days after the meeting, on July 21, 1999, appellant put the incident of the sick time abuse accusation into written form, and submitted it to Chief Bell. Appellant did not receive any response to the writing from Chief Bell. The trial court

6.

excluded the July 21, 1999 writing, identified as Exhibit 35, from being entered into evidence.

{¶ 16} Appellant then turned her testimony to her time as a captain at the Fire Prevention Bureau. Appellant testified that her July 1999 meeting with Coleman had ended when Assistant Chief Koenigseker knocked on the door to Coleman's office. Appellant had worked for Koenigseker for a short time at the beginning of her career, and had made a favorable impression. Koenigseker told appellant that there would soon be an opening for a captain at the Fire Prevention Bureau, and he thought appellant would be a good fit. Within three weeks of the meeting with Coleman, appellant agreed to make the transfer. Appellant testified that she transferred to get away from Coleman because he was harassing her. Appellant further explained that although she very much liked working on the line, and although she wanted to continue to work on the line because it garnered respect, especially for a woman, she believed that the situation with Coleman had become untenable, and that it actually created a dangerous situation because the other firefighters knew that they could bypass the chain of command and could disrespect her orders.

{¶ 17} Appellant became Acting Captain of the Fire Prevention Bureau on October 3, 1999. On the same day, appellant testified that the arson department was removed from the Fire Prevention Bureau's oversight. Appellant explained that the previous captain had earned additional pay by being an arson investigator. In addition, it

was a highly respected position where the arson investigator would be able to go out in fire gear and work side by side with people on the line. Appellant would have liked to have had those opportunities. In addition to the removal of the arson department, appellant testified that the other departments under her supervision were gradually diminished. By May 2005, appellant's responsibility had fallen from overseeing approximately 20 people down to one person.

{¶ 18} In February 2002, Chief Bell moved Coleman from being the Operations Deputy, and made him the Deputy Chief of the Fire Prevention Bureau, which placed him as appellant's immediate supervisor. Around the same time, appellant was promoted to Acting Battalion Chief. Appellant testified that on March 28, 2002, Coleman offered her the Battalion Chief's office, and appellant moved into the office over the weekend. However, on Monday, April 1, 2002, Coleman told appellant to move out, stating that he decided to give the office to his secretary instead. Appellant complained about this incident to Chief Bell.

{¶ 19} On June 5, 2002, appellant made a formal complaint of the existence of a hostile work environment during a meeting with Chief Bell. The complaint was based upon appellant's experience with Coleman. Appellant testified that later on the same day that she made the complaint, she was removed as Acting Battalion Chief. Appellant explained that Coleman informed her that she was no longer the Acting Battalion Chief, and that "a line was drawn in the sand," referencing her complaint to Chief Bell.

8.

Appellant was required to move out of the office, and a Battalion Chief was placed between her position and Coleman. The Acting Battalion Chief position was then given to a male in the Training Bureau. Appellant testified that she was more qualified than the male who took the Acting Battalion Chief position: she had more time in her rank, had done significantly better on the promotion test and oral interview, and had done very well in the position up until making the complaint.

{¶ 20} Regarding the complaint that appellant verbally made on June 5, 2002, appellant testified that she reduced her concerns to writing, and submitted a written complaint on July 3, 2002. Upon the objection of the defendants, the trial court precluded appellant from entering the written complaint, identified as Exhibit 39, into evidence. Appellant was also prohibited from testifying to the allegations contained in the complaint. Appellant did, however, testify that no investigation was ever conducted as a result of the complaint.

{¶ 21} In January 2003, appellant brought to Coleman's attention the fact that she did not receive increased pay during the period following June 2002 for the times that she was the Battalion Chief in an acting capacity due to another officer's vacation or illness. Appellant testified that Coleman told her that the department policy of moving up a rank when a person on staff took vacation or sick leave did not apply to her. Appellant then put in an "acting" slip, which Coleman denied. Following that, appellant contacted the union, and it was determined that appellant should have been putting in for "acting" time

9.

during the period, and because she did not, she would not be compensated retroactively, but would be so compensated going forward.

{¶ 22} Appellant also testified that in 2003, her orders were being undermined. Appellant explained that she had two lieutenants under her command, and part of her responsibility was to assign certain housekeeping chores such as spraying down the apparatus floor, or putting up the funeral flag. Appellant testified that it became a regular occurrence that whenever one of the lieutenants did not want to do a certain chore, he would go around appellant to the battalion chief or the deputy chief and have his assignment changed.

{¶ 23} Appellant then testified that in January 2004, she had a brief conversation with Chief Bell in the hallway. Appellant stated that Coleman had previously forbidden her from directly approaching Chief Bell for any reason. Following the conversation, Coleman told appellant that talking to Chief Bell would "bite [her] in the butt." Coleman stated "not that I don't like you, not that I don't think you do a good job, not that I want you to leave the Bureau, but Chief Bell doesn't like it when you leave work at 4:00 p.m." Appellant testified that this surprised her because the conversation itself happened at 5:30 p.m., and appellant spent as much or more time at the department than any lieutenant or captain. Appellant testified that she was concerned regarding what information Coleman was relaying to Chief Bell. Appellant brought up this issue to Chief Bell, who told her

10.

that he understood what was going on, and said that they would have a meeting with Coleman. However, that meeting never occurred.

{¶ 24} Also in 2004, appellant had an issue with a secretary in the bureau. Appellant testified that she got along fine with the secretary until Coleman came to the bureau in 2002. Appellant stated that Coleman allowed the secretary to pick and choose what duties she wanted, which caused a lot of conflict. In August 2004, appellant questioned the secretary about some inaccurate information that the secretary had conveyed to Chief Bell. Appellant testified that the secretary became irate and started shouting at her. The shouting was overheard by appellant's supervisor, Battalion Chief Pettaway. In response to the situation, appellant wrote a communication about the incident. Subsequently, a meeting was held between appellant, Coleman, and Pettaway. During the meeting, Coleman stated that if appellant had told him what had happened then he would not take it seriously, but because Pettaway observed it then the matter should be sent to human resources.

{¶ 25} Following a discussion with human resources, several options were presented to Coleman. While presenting the options, Coleman remarked to appellant that he assesses women by how long he thinks he could be married to them, and in the case of the secretary, it would be about two weeks. Coleman also stated that women are like computers, they are sometimes helpful but mostly make you mad. Coleman then

11.

indicated that Chief Bell did not want to do anything about the situation, and that it would be best for appellant's career to just go along.

{¶ 26} Thereafter, a meeting was held with the secretary, Coleman, Chief Bell, and appellant. Appellant testified that Coleman turned the meeting against her, and said that appellant had badgered the secretary. As a result of the meeting, there was no discipline for the secretary, and she was moved into a private office. Appellant was then assigned some of the secretary's duties such as answering the phones, greeting people at the counter, and sorting the mail. Appellant testified that the outcome was different than in 2002 when there was a confrontation between a clerical worker and a male lieutenant. In that instance, the clerical worker was sent home on administrative leave and had to go to anger management.

{¶ 27} At the end of the incident with the secretary, appellant made a complaint with internal affairs. However, during her discussion with the internal affairs officer, he put his hands over his ears and said that he did not hear anything.

{¶ 28} In September 2004, in response to everything that was happening to her, appellant contacted the Employee Assistance Program, which referred her to a psychologist, Dr. Trudy Bond.

{¶ 29} Appellant also testified that during this time, Coleman took appellant's responsibility of filing false alarm reports, and gave that to the secretary. Appellant filed a grievance with the union over the matter. During the grievance process, Coleman

12.

inappropriately approached appellant about the subject outside of the grievance process, and told appellant that Chief Bell was very angry with her for filing the grievance. Ultimately, the grievance was resolved and the responsibility of filing the false alarm reports was restored to appellant.

{¶ 30} Appellant next testified that at one point she was sent with two other officers to sit on a panel in another city for accreditation. Pursuant to department policy, appellant should have accrued flex time for the trip, but Coleman did not allow her to take the flex time. Coleman told appellant that flex time did not apply to her and that if she wanted to file a grievance she could, but that a lot of people would be mad at her. Appellant chose not to file a grievance.

{¶ 31} In March 2005, appellant was ordered to move from headquarters to the Fire Museum, where she was to work on a program for fire safety for senior citizens. Appellant suggested that it would be better for a lieutenant to move out to the museum, and for appellant to remain at headquarters where she could supervise the Inspections, Plan Review, and Arson departments. Coleman disagreed, and told appellant that according to Chief Bell she should spend at least 90 percent of her time at the Fire Museum. When appellant asked Coleman how she was supposed to accomplish her captain responsibilities when she was three-and-a-half miles away from the staff at the Fire Prevention Bureau, Coleman told her to be creative and that she was being held to a lesser standard. After the move, whenever appellant would see Coleman at headquarters,

13.

he would say to her, "aren't you supposed to be at the museum?" Appellant testified that during this time, one of her subordinates, Lieutenant Bosak became in charge of the Inspection, Plan Review, and Arson functions of the Fire Prevention Bureau, and appellant was given a new title of Captain of Public Education. As a result, Bosak was supervising nine people, while appellant was supervising only one.

{¶ 32} While working out of the museum, appellant was tasked with scheduling firefighters to attend various fireworks displays across the city. Appellant testified that near the end of the day on Friday, July 1, 2005, Coleman contacted appellant and informed her that half of the firefighters who were scheduled were no longer eligible to work the overtime required to attend the fireworks displays. Appellant testified that Coleman was aware of this fact in May when a union grievance had been settled over the issue. Appellant then had to call and cancel the people who were no longer eligible to work, and had to call other people to find replacements to staff the events.

{¶ 33} One of the individuals that appellant contacted while trying to reschedule the fireworks events was Firefighter and Arson Investigator Bembenek. Despite Bembenek being a private, and thus subject to appellant's orders, appellant gave Bembenek a few minutes to decide whether he was going to accept a reassignment. During that time, appellant received a call from Coleman stating that Bembenek would not have to work overtime. Appellant later discussed the issue with Coleman, and wondered how it came to be that Coleman contacted appellant instead of Bembenek.

14.

Coleman stated that Bembenek contacted Deputy Chief Metzger, who then had him contact Coleman. Appellant asked if it was appropriate for a firefighter to contact a deputy chief to have an assignment changed, and Coleman replied that it was not. Coleman directed appellant to have Lieutenant Bosak write a communication as to why a firefighter circumvented the chain of command.

{¶ 34} On July 14, 2005, appellant received the communication from Bosak, as well as a communication from Bembenek. As a result of the communications, appellant recommended that Bosak be counseled for not understanding when it is appropriate to go outside of the chain of command, and that Bembenek should be disciplined for going outside of the chain of command. Coleman, though, was not happy with appellant's recommendation, and did not agree to it. According to appellant, Coleman stated that Bembenek circumvented the chain of command in theory, but "when a man admits that he didn't really know who to go to with a problem then it's not really circumventing the chain of command."

{¶ 35} Appellant thought that the July 14, 2005 recommendation was the end of the matter. However, on July 20, 2005, Coleman attempted to counsel appellant for creating a hostile work environment on the basis that the people appellant contacted about the fireworks displays did not like her tone. Appellant stated that several of those people had written communications to Coleman, and she was permitted to look at them. Appellant determined that the communications were "downright lies," and she refused to

sign or accept the counseling. Appellant testified that Coleman explained that she should not be angry at him for the firefighters lying to him because the firefighters thought that appellant was going after Bembenek. Appellant further testified that Chief Bell and human resources did not think that appellant's actions created a hostile work environment, but Coleman was not convinced, and contemplated charging her with conduct unbecoming for working in her uniform after 4:00 p.m. During the same meeting, Coleman also removed some of appellant's job responsibilities in that she was no longer eligible to work "Fire Watch," and she was to have no contact with Bosak or have anything to do with the Arson division. Coleman stated that the decision to remove her from Arson came from Chief Bell, to which appellant replied that Chief Bell got all of his information from Coleman. In sum, appellant stated that it was a very confusing conversation for her because on the one hand, Coleman told her she did a great job in the limited amount of time that she had to do it, but on the other hand he was contemplating charging her with conduct unbecoming and was taking away some of her job responsibilities.

{¶ 36} Following the July 20, 2005 meeting, appellant described that she was devastated and in shock, and felt like her career was over. Therefore, appellant contacted Dr. Bond, whom she had been meeting with for approximately one year. On July 21, 2005, appellant, through Dr. Bond, requested 30 days of FMLA ("Family Medical Leave Act") leave. Appellant was then required to see the city's doctor for a fitness of duty

16.

exam, after which the city's doctor concurred that appellant should be on leave. Appellant testified that contrary to FMLA policy, Coleman was made aware of appellant's medical diagnosis, and Coleman informed other departmental staff of appellant's medical condition by email. Ultimately, appellant took 12 weeks of FMLA leave, as well as additional sick and vacation time, and did not return to work until November 22, 2005.

{¶ 37} On November 21, 2005, one day before she returned to work, appellant initiated the present lawsuit. Appellant testified that during a subsequent departmental staff meeting, Coleman brought up the lawsuit and passed around a copy of it in appellant's presence.

{¶ 38} Appellant next testified that when she returned to work, she was responsible for one person in the Public Education section, and then she was assigned cleaning duties for the Radio Services section by Coleman. Notably, Radio Services is not part of the Fire Prevention Bureau. While she was commuting between her office at the Fire Museum and Radio Services in a city car, appellant was involved in a motor vehicle accident in the winter of 2005-2006. The accident occurred when someone made an illegal left-hand turn in front of her. As a result of the accident, appellant began experiencing back and knee pain, and was placed on limited duty.

{¶ 39} While on limited duty, appellant was given the job duty to get files out of a men's bathroom where they were being stored, and to clean the unisex bathroom on the

17.

apparatus floor, despite the fact that a public contractor was responsible for cleaning the bathrooms.

{¶ 40} Appellant also recounted an issue during 2006 regarding how she utilized her vacation time. Appellant submitted her requests for vacation time for the year in January 2006, and those requests were approved. In March, however, appellant learned that Coleman subsequently denied her requests. Coleman informed appellant that he and Chief Bell did not like the pattern of vacation time that appellant was using. When appellant brought up the fact that other people used the same vacation pattern of taking a day or two each week in the summer, Coleman told her that he would not enforce that with the other people because he respected them. In response, appellant filed a grievance, which was fairly quickly resolved in appellant's favor.

{¶ 41} Appellant then testified that on May 16, 2006, Chief Bell became aware that appellant had been secretly tape recording her conversations with different individuals beginning in September 2004. There were 21 recordings, 14 of which were recordings of conversations with Coleman. Appellant testified that it was her understanding that the recordings were not illegal, nor were they against any Toledo Fire Department policy. When Chief Bell learned about the recordings, he summoned appellant to his office, and informed her that if the matter went to a hearing, Chief Metzger would not be the prosecutor, and Chief Bell would not be the hearing officer because both Bell and Metzger were named as defendants in the lawsuit. Appellant was

18.

then informed by letter on May 19, 2006, that she was being suspended with pay. After approximately one month, appellant was suspended without pay for approximately one and one-half years.

{¶ 42} In November 2006, a termination hearing was held based on the charge of conduct unbecoming. Chief Metzger was the investigator and prosecutor at the hearing. Following the hearing, appellant's employment was terminated upon the recommendation of the hearing officer, then Assistant Chief Wolever. Appellant then worked with the union to challenge the termination through arbitration proceedings. An arbitration hearing was held on July 17, 2007, and August 1, 2007. As a result of the arbitration, it was deemed that appellant was unjustly terminated. Appellant was ordered to be reinstated to her position of Captain in the Fire Protection Bureau, or one of equal status, authority, and dignity as it related to her education and experience. The city was also ordered to pay appellant all of her back wages.

{¶ 43} Appellant returned to work on January 3, 2008. Notably, one day before she returned, the Fire Department enacted an "electronic recording and monitoring" policy, signed by Chief Wolever. Despite the order to reinstate appellant to the same or equal position, appellant was assigned to limited duty work under a captain in the Emergency Medical Services ("EMS") Bureau. The limited duty assignment was because appellant was still experiencing back pain attributable to the motor vehicle

19.

accident. However, appellant stated that she was capable of performing the functions of the captain of the Fire Prevention Bureau.

{¶ 44} Appellant was in the position with the EMS Bureau for approximately nine months, except for a short period of time where she was assigned to answer phones at "Call City Hall." Appellant testified that her assignment to "Call City Hall" was made within a couple of days of the court of appeals returning a decision in this lawsuit. Appellant testified that to her knowledge, no firefighter had ever been sent to "Call City Hall" before.

{¶ 45} While at the EMS Bureau, appellant was tasked with reviewing paramedic run reports, which is a function that could be done by a captain if the captain was a paramedic. Because appellant was not a paramedic, she believed that she was not qualified to do the report reviews. Nor did she believe that her job assignment was one of equal status, authority, or dignity compared to her position as captain of the Fire Prevention Bureau. Appellant stated that she had never seen someone with a bid position be placed in a position outside of his or her bid. Appellant further testified that in her experience, other staff members had been assigned to their bid positions while they were on limited duty. Additionally, appellant testified that there were several individuals who were on limited duty who were assigned to the Fire Prevention Bureau.

{¶ 46} Appellant testified that in 2008, she was still interested in furthering her career. On March 3, 2008, appellant submitted her request to be interviewed for a

battalion chief position that had become available. Chief Wolever, however, denied her request for an interview, thereby foreclosing her from the opportunity.

{¶ 47} On September 30, 2008, appellant received notice that her 13 months of limited duty time was exhausted, and that she would be taken off of payroll. Appellant explained that she had used three months of limited duty time in 2006, and nine months in 2008. Appellant claimed that the 13-month policy was arbitrary, but the trial court prevented her from testifying that Chief Wolever had the discretion to extend limited duty time, and had done so for others in the past.

{¶ 48} Appellant testified that after receiving the notification, she applied for disability. Appellant did not want to leave the employment of the Fire Department, but she believed she had no other options. Finally, appellant testified that she continues to have intermittent feelings of depression resulting from her experience at the Fire Department and the progress of her lawsuit.

{¶ 49} On cross-examination, appellant was asked if she was upset during the fireworks display incident in July 2005 because it interfered with her plans to go up to the animal farm that she owned in Canada. Appellant denied that she was upset. Appellant was then asked questions about the property in Canada, over her objection, and a property listing describing the home was also admitted, over her objection.

{¶ 50} Following appellant's testimony, appellant called Chief Bell as if on cross-examination. Chief Bell testified that "on a pretty regular basis, [appellant] had

something that she didn't like that was going on," and he agreed that it was possible that what appellant testified to was correct, but he could not remember. Bell testified generally that he did not think that any of appellant's complaints warranted further action on his part. Bell also suggested that many of appellant's problems occurred or became worse due to jealousy after Christine Davis became the first female Battalion Chief, even though Davis was not promoted until after appellant's June 2002 complaint, and even though appellant was not even eligible to be promoted to Battalion Chief at that time.

{¶ 51} Regarding appellant's move to the Fire Museum, Bell testified that the mayor had instructed him to reduce overtime in Field Operations. As a result, many positions were reassigned. Bell testified that appellant was moved to the Fire Museum to replace the firefighter that was stationed there, so that that firefighter could be moved back into Field Operations. Bell explained that appellant was smart, intelligent, and had expressed an interest in public education, and it was well known throughout the fire department that appellant did not want to go back into Field Operations. Thus, Bell thought that he could help appellant find a place where she could be successful, and help her avoid some of the difficulties that she had previously experienced in Field Operations.

{¶ 52} When asked about appellant secretly tape recording her conversations, Bell testified that the recordings caused a lot of trust issues between appellant and other members of the fire department. Bell also acknowledged that the impetus for the

22.

recordings was that appellant did not trust others, particularly Coleman. Bell testified, however, that he thought the issues between Coleman and appellant stemmed from a personality conflict more than anything else. Bell noted that the rest of the fire department, whether male, female, black, or white, did not have any issues with Coleman.

{¶ 53} Appellant then called Coleman as on cross-examination. When speaking about the first interaction in 1997, when Coleman was an instructor and appellant came to him after a class, Coleman testified that appellant's explanation of the problem at the time caused him to think that the situation was more serious than it really was. Coleman testified that appellant said that the rest of her crew "bailed" on her, which Coleman thought meant that the crew left her inside of a building during a fire. When Coleman confronted the crew, he learned that the crew had responded to a minor EMS run, which in their experience did not warrant further attention, but they could not convince appellant of that fact, so they walked back to the truck. Coleman testified that no one was disciplined in any way from this incident. Upon reflection, Coleman interpreted the situation as an indicator that appellant was more concerned about herself than the mission of the fire department. He did not provide any guidance to help her change course, however, because he viewed the situation as over and done with, and that it was time to move on.

23.

{¶ 54} Coleman next testified on the subject of the allegation of sick time abuse. Coleman testified that the decision of who would ride on the engine and who would ride on the truck was made based upon experience on the particular rig, not seniority, and Coleman characterized appellant's unilateral decision to switch assignments as a minor issue, on par with disputes over who has to cook dinner at the station. Coleman also testified that the allegation of sick time abuse in this case was a minor issue, but because he received a communication from Battalion Chief Keating he could not simply ignore it. Coleman described that there was no formal investigation, and that he simply asked appellant for her side of the story. Coleman testified that he believed appellant that she was sick on the day that she went home, and that ended the matter with no adverse consequences for appellant.

{¶ 55} Turning to the issue of requiring appellant to move out of the battalion chief's office in early 2002, Coleman confirmed that the incident happened. Coleman testified that he told appellant to move into the office on a Friday, and appellant did so over the weekend. The next Monday, Chief Bell had a discussion with Coleman and pointed out that Coleman was the only deputy chief who did not have a secretary close by as a gatekeeper. Chief Bell suggested that the time was right for Coleman to move his secretary closer. Coleman testified that he felt bad about asking appellant to switch offices, and he apologized to her and told her that the Chief wanted his secretary to be in the office.

{¶ 56} Coleman also testified regarding appellant's disputes with a different secretary in the office in the fall of 2004. Coleman testified that the secretary was not hesitant to speak her mind, and that she and appellant did not get along. Coleman explained that 98 percent of the time there was not an issue, but every once in a while they would get into a dispute. As to appellant's specific allegations, Coleman did not remember the meeting with appellant and Chief Pettaway, and did not remember ever saying that he would take the issue with the secretary seriously only because Chief Pettaway was involved. Coleman also did not remember appellant and the secretary switching assignments, but also explained that answering the phone was a miniscule part of the job.

{¶ 57} Regarding the denial of increased pay for appellant's time as acting battalion chief, Coleman testified that he could not remember why he denied appellant's slip for increased pay, but that ultimately it was not his decision. Coleman testified that the pay structure was contractually set out in the collective bargaining agreement, and if she was eligible for increased pay, then payroll would override his denial and pay the appropriate rate.

{¶ 58} As to the reduction of units overseen by appellant, Coleman testified that the reason for that reduction was primarily budget cuts in the division. Coleman then explained appellant's move from the Fire Prevention Bureau at headquarters to the Fire Museum. Coleman testified that shortly before the move, there was a fire in the city that

resulted in the death of four children. The mayor became involved, and wanted to go to the Fire Museum, which was essentially shuttered at the time, to see what resources were available to provide fire education for the very young. Coleman testified that appellant had just done a very good job of producing a fire safety program for senior citizens, so she was tasked with doing fire safety education at the museum. Coleman explained that even though there were budget cuts in place at the time, fire safety education was a priority for the mayor, and the requirement that appellant spend 90 percent of her time at the museum came from the mayor. Coleman knew that appellant still had responsibilities at the Fire Prevention Bureau, so he told her to do the best that she could with the limited resources that she had. During this time, Coleman had a long conversation with appellant—which appellant tape recorded—trying to address her concerns, and reassuring her that she was not being punished, but that the moves were budgetary and that she should just keep doing what she was doing.

{¶ 59} Coleman next testified to a time where appellant had made a suggestion for a way to be more efficient, and Coleman initially agreed, but later changed his mind. Coleman stated that the next day, Chief Bell called him to his office and said that he just had a conversation with appellant at 5:30 at night, during which she indicated that she was not happy that Coleman changed his mind. Coleman testified that he did not appreciate appellant's actions, and believed that she was going over his head, but he insisted that he never told her that she was not allowed to talk to the Chief.

26.

{¶ 60} This was the same conversation that also included a criticism that appellant left at 4:00. Coleman relayed that Chief Bell had noticed that appellant was leaving at 4:00 on the nose, and that he did not appreciate a "minute man." Upon questioning, Coleman agreed that appellant sometimes arrived early, or stayed late, but explained that she drove with her husband, and that if she was there late, she had the option of working or playing solitaire on the computer. Coleman admitted that appellant got all of her work done, but commented that she was the "queen of delegation." He also testified that, knowing appellant as he did, if she worked overtime, she would have requested to be paid for it.

{¶ 61} Turning to the scheduling of overtime for the fireworks displays in July 2005, Coleman testified that it was oversight that led to the realization that certain firefighters were not eligible to work the fireworks displays. Coleman stated that out of a crew of 15 to 20 people, seven or eight of them were ineligible to work. Coleman testified that appellant was able to fix the situation, and that she did an excellent job of it.

{¶ 62} Coleman then discussed the particular situation with Bembenek. Coleman testified that he received some communications alleging that appellant created a hostile work environment while rescheduling the coverage for the fireworks displays. Coleman called appellant to his office and showed her what he received. Coleman denied that he told appellant he was investigating her for creating a hostile work environment, but simply wanted to inquire about the situation. Coleman explained that when appellant

27.

called Bembenek to move him to a different fireworks display, Bembenek resisted a little because he had plans to have his family come to the fireworks display with him. At that point, appellant gave Bembenek 15 minutes to discuss with his family whether he wanted to take the overtime pay and work a different display, or whether he wanted to pass on the overtime to be with his family, and she would find a different person to work. Coleman testified that when Bembenek tried to call appellant to let her know of his decision, he could not get through to her on the phone. Bembenek then tried to call his lieutenant, who also did not answer. Bembenek then called Chief Metzger, who told him to contact Coleman. Coleman testified that Bembenek informed him of his decision, and then Bembenek stated to Coleman his intention to try and call appellant again. Coleman informed Bembenek that there was no need to try to call appellant because she was working in the office next door to Coleman, and he would just tell her. Coleman then walked across the hallway and told appellant what Bembenek's decision was. Several days after that, appellant wanted Coleman to charge Bembenek with violating the chain of command, but Coleman encouraged her to just issue a counseling.

{¶ 63} Coleman also testified about appellant's insinuation as to the reason that she was sent to help clean and organize Radio Services. Coleman testified that Chief Bell wanted her there because she has great organizational skills. Coleman noted that appellant did very well at accomplishing the task.

{¶ 64} Turning to the "line in the sand" comment, Coleman testified that to the best of his recollection he made that comment after appellant spoke with Chief Bell in the hallway at 5:30 p.m. in January 2004 to complain about one of Coleman's decisions. Coleman explained that he made the comment after he realized that appellant was not above going over his head. Coleman did not agree that he made that comment following appellant's removal from Acting Battalion Chief in June 2002, and the court did not permit appellant to introduce her written complaint to Chief Bell from July 2002, in which she notes Coleman's "line in the sand" comment.

{¶ 65} As to appellant's use of vacation time in 2006, Coleman testified that Chief Bell did not like the practice of using a couple of days each week in the summer. Coleman, for his part, did not concern himself with the use of vacation time so long as there was coverage for the positions. Coleman noted that Chief Bell also took exception to a person in Radio Services taking every Wednesday off to go fishing.

{¶ 66} Finally, Coleman denied ever passing around a copy of appellant's lawsuit against the fire department.

{¶ 67} Appellant next called Chief Michael Wolever. Wolever testified that he was the hearing officer when appellant was charged with conduct unbecoming an officer for surreptitiously tape recording her conversations. Wolever testified that to him the tape recordings were unforgiveable, and that appellant's prior work history was not important.

29.

**{¶ 68}** Wolever also testified that he was the Fire Chief when appellant's limited-duty time expired. He acknowledged that the letter he sent to her at the time indicated that he had the ability to extend the limited duty. However, Wolever testified that he decided to stick with the unwritten policy to not allow limited duty beyond 13 months.

**{¶ 69}** The next witness to testify was Dr. Trudy Bond, who was certified as an expert witness in psychology. Bond testified that she began treating appellant in September 2004, and saw her through November 2009. Bond diagnosed appellant with major depressive disorder and generalized anxiety disorder. Bond documented the deterioration of appellant's physical and psychological well-being from 1998 through 2009. Bond testified that appellant's prognosis was poor when she stopped seeing appellant because appellant moved out of town.

**{¶ 70}** Following Bond's testimony, there was a discussion regarding whether appellant would be permitted to present a video-taped deposition of James Matthews as an expert witness on the economic costs suffered by appellant. The trial court ultimately ruled that Matthews' testimony was inadmissible because appellant had not provided any expert witness testimony as to why appellant had to retire from the fire department, i.e., whether appellant had to retire because of her depression or whether she had to retire because of her back injury.

**{¶ 71}** Appellant next called Deputy Chief Robert Metzger as her final witness. Metzger testified that despite being named a defendant in appellant's lawsuit, he

30.

conducted the investigation into her charges of conduct unbecoming an officer for surreptitiously tape recording her conversations. Metzger testified that he was informed that he could conduct the investigation since he was not in the position to make any final determination about the charges. In conducting the investigation, Metzger was primarily concerned with the erosion of trust that was caused by the secret tape recordings, and was less concerned with the circumstances that led to appellant feeling the need to create the tape recordings.

{¶ 72} Thereafter, appellant rested.

{¶ 73} Appellees then called their first witness, Dr. Sheldon Kaffen. Kaffen testified that he conducted an evaluation of appellant on October 9, 2006, for a claim of total and permanent disability. Following the evaluation, Kaffen concluded that appellant was permanently and totally disabled from any gainful employment due to injuries sustained to her left knee, neck, and lower back. Kaffen then saw appellant again on July 25, 2008. Kaffen testified that he assumed appellant saw him again in 2008 because she was not awarded disability following the 2006 evaluation. Kaffen testified that by 2008, appellant's back pain had become more severe and constant due to degenerative disc disease. Kaffen again concluded that appellant was permanently and totally disabled. Kaffen testified on cross-examination, however, that he was not aware that by 2006 and 2008, appellant was Captain of the Fire Prevention Bureau, and was therefore an administrator, not a firefighter on the line.

31.

**{¶ 74}** Appellees next called retired Battalion Chief Christine Davis. Davis testified that she was the first female promoted to lieutenant, captain, and battalion chief in the Toledo Fire Department. Davis testified that she worked under Coleman, and had a good working relationship with him. Davis described Coleman as generous and easygoing. Davis also worked with appellant. She described that she never had any real issues with appellant, and that appellant did an excellent job. However, Davis also noted that she felt like appellant resented working underneath her, and would tarry in turning over information on projects on which she was working.

**{¶ 75}** The final witness to testify was Captain Sharyl Close. Over appellant's objection, Close testified to how many women were currently officers within the Toledo Fire Department. On cross-examination, appellant questioned Close over her signature on a petition in support of appellant during the proceedings surrounding her suspension for surreptitiously recording conversations. However, the trial court did not permit appellant to introduce the petition itself, identified as Exhibit 58.

**{¶ 76}** Following the presentation of appellees' evidence, appellees moved for a directed verdict on the issue of qualified immunity. After arguments from counsel, the trial court granted a directed verdict for the individual defendants, finding that there was no evidence that the individual defendants acted maliciously, recklessly, in bad faith, or with any wanton misconduct.

32.

{¶ 77} The trial then moved to rebuttal testimony. Notably, appellant first tried to call two witnesses to rebut Close's testimony regarding the current numbers of female officers, which appellant characterized as evidence of subsequent remedial measures. The trial court denied appellant the opportunity to call those witnesses on rebuttal. Appellant then briefly testified again on her own behalf pertaining to minor matters.

{¶ 78} At the close of all of the evidence, the parties discussed proposed jury instructions. Notably, appellant objected to the court's instruction on retaliation, and the trial court's rejection of appellant's request for an instruction on hostile work environment.

{¶ 79} Finally, after closing arguments and instructions, the jury retired to deliberate. The jury returned with a verdict in favor of appellee, the city of Toledo, and against appellant. As to the gender discrimination claim, the jury did not find that appellant suffered an adverse employment action by the city of Toledo. As to the retaliation claim, the jury did not find that the city of Toledo intended to retaliate when it terminated appellant and/or changed her job requirements.

## II. Assignments of Error

{¶ 80} Appellant has timely appealed the judgment entry memorializing the jury verdicts against her, and now presents five assignments of error for our review:

1.  The trial court erred in excluding multiple exhibits and associated testimony from the record as hearsay when the exhibits were otherwise admissible under the Rules of Evidence.

2.  The trial court failed to provide jury instructions that correctly and completely state the law and committed reversible error.

3.  The trial court improperly weighed the evidence and erroneously granted Defendants a directed verdict on their personal liability.

4.  The trial court improperly excluded Plaintiff's economics expert and wrongfully curtailed her damages presentation.

5.  The probative value of subsequent remedial measures testimony about the status of women in the Fire Department in 2019 was outweighed by its undue prejudice.

### III.  Analysis

{¶ 81} Before analyzing appellant's assignments of error, we think it pertinent to define appellant's claims upon which she sought relief.

{¶ 82} First, appellant brought a claim for gender discrimination under R.C. 4112.02(A), which provides, "It shall be an unlawful discriminatory practice:  (A) For any employer, because of the * * * sex * * * of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to

hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."

> [A] plaintiff may establish a violation of R.C. 4112.02(A)'s prohibition of discrimination "because of * * * sex" by proving either of two types of sexual harassment: (1) "*quid pro quo*" harassment, *i.e.*, harassment that is directly linked to the grant or denial of a tangible economic benefit, or (2) "hostile environment" harassment, *i.e.*, harassment that, while not affecting economic benefits, has the purpose or effect of creating a hostile or abusive working environment.

*Hampel v. Food Ingredients Specialties, Inc.*, 89 Ohio St.3d 169, 176, 729 N.E.2d 726 (2000). Here, appellant pursued a theory of hostile-environment sexual harassment.

> In order to establish a claim of hostile-environment sexual harassment, the plaintiff must show (1) that the harassment was unwelcome, (2) that the harassment was based on sex, (3) that the harassing conduct was sufficiently severe or pervasive to affect the "terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment," and (4) that either (a) the harassment was committed by a supervisor, or (b) the employer, through its agents or supervisory personnel, knew or should have known of the harassment and failed to take immediate and appropriate corrective action.

*Id.* at 176-177. Notably, "harassing conduct that is simply abusive, with no sexual element, can support a claim for hostile-environment sexual harassment if it is directed at the plaintiff because of his or her sex. However, harassment is not automatically discrimination because of sex merely because the words used have sexual content or connotations." *Id.* at 180. "[I]n order to determine whether the harassing conduct was 'severe or pervasive' enough to affect the conditions of the plaintiff's employment, the trier of fact, or the reviewing court, must view the work environment as a whole and consider the totality of all the facts and surrounding circumstances, including the cumulative effect of all episodes of sexual or other abusive treatment." *Id.* at 181.

{¶ 83} Second, appellant brought a claim for retaliation under R.C. 4112.02(I), which prohibits "any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code."

{¶ 84} To establish a prima facie case of retaliation, a claimant must prove that "(1) she engaged in a protected activity, (2) the defending party was aware that the claimant had engaged in that activity, (3) the defending party took an adverse employment action against the employee, and (4) there is a causal connection between the protected activity and adverse action." *Greer-Burger v. Temesi*, 116 Ohio St.3d 324,

36.

2007-Ohio-6442, 879 N.E.2d 174, ¶ 13. "If a complainant establishes a prima facie case, the burden then shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for its actions." *Id.* at ¶ 14, quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). "If the employer satisfies this burden, the burden shifts back to the complainant to demonstrate 'that the proffered reason was not the true reason for the employment decision.'" *Id.*, quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

### A. Hearsay

{¶ 85} With the background of the claims in mind, we now turn to appellant's first assignment of error, in which she argues that the trial court erred when it excluded numerous pieces of evidence as hearsay, highlighting five exhibits in particular.

### 1. Standard of Review

{¶ 86} In general, the trial court has broad discretion regarding the admissibility of evidence in any particular case, "so long as such discretion is exercised in line with the rules of procedure and evidence." *Rigby v. Lake Cty.*, 58 Ohio St.3d 269, 271, 569 N.E.2d 1056 (1991). However, "[w]hile there is discretion to admit or exclude relevant evidence, there is no 'discretion' to admit hearsay." *State v. Richcreek*, 196 Ohio App.3d 505, 2011-Ohio-4686, 964 N.E.2d 442, ¶ 29 (6th Dist.). Thus, "[a]n appellate court applies a de novo standard of review to a trial court's decision regarding whether

evidence is hearsay or non-hearsay under Evid.R. 801." *XPX Armor & Equip., Inc., v. SkyLIFE Co., Inc.*, 2020-Ohio-4498, 158 N.E.3d 1024, ¶ 97 (6th Dist.).

{¶ 87} In addition to reviewing the trial court's decisions regarding hearsay, we must also consider the effect of these rulings. "The appealable error * * * may not be predicated upon a ruling which excludes evidence unless a substantive right of a party is affected." *O'Loughlin v. Ottawa St. Condo. Assn.,* 6th Dist. Lucas No. L-16-1128, 2018-Ohio-327, ¶ 47, citing Evid.R. 103(A). As provided by Civ.R. 61, "No error in either the admission or the exclusion of evidence * * * is ground for granting a new trial or for setting aside a verdict * * *, unless refusal to take such action appears to the court inconsistent with substantial justice."

{¶ 88} Evid.R. 801(C) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

### 2. Exhibit 35

{¶ 89} In her brief, appellant first argues that the trial court erred when it excluded Exhibit 35 as hearsay. Exhibit 35 is a July 21, 1999 "Incident Documentation" written by appellant and addressed to Chief Bell. In the document, appellant describes the incidents surrounding her switching of assignments from the engine to the truck, her use of a sick day, and the subsequent accusation that she was feigning an illness. Appellant writes:

You have told me in the past that I can come to you with problems or concerns I encounter. I have told you that I will always try to handle the situations myself. However, due to a recent situation in which a battalion chief felt the need to document a situation, I realize that I must also start documenting these types of situations. I have never asked for any special treatment. I work very hard and studied very hard to be in the position I am currently in. In return I feel that I should be treated the same as everyone else. But, I am told I am not treated the same because I need more experience, I need to be tougher, I need to be stronger, etc.

The purpose of this memorandum is to document my position, which resulted from an incident occurring on July 4, 1999. On July 4, 1999, I arrived at work feeling terrible. I have come to work not feeling well before; however, I do not like to use sick time if I do not have to. I knew I would be at Station 17 working with a less senior officer, Lt. Gutierrez. I assumed that I would be working the truck. In all my past experiences the senior officer had the options of rigs. I am well aware of this unwritten policy as I have been bumped off the truck on more than one occasion, been given night watch, and assigned the engine even when the officer I was working with was on a trade with the engine officer. I was assigned the engine and they [sic] the truck and the battalion chiefs apparently advocated

this unwritten policy. When I arrived at the station, I was surprised to find that I was on the engine and Lt. Gutierrez was on the truck. I know from past experience, picking vacation, being bumped to another shift etc., battalion chiefs have mistaken my seniority. Also, Lt. Gutierrez is a paramedic and would be the better choice to work on the engine. Therefore, I changed the sheet and put myself on the truck and Lt. Gutierrez on the engine. Lt. Takets was there at the time and stated he thought I'd want the engine considering the fact I had no experience.

When Lt. Gutierrez arrived at the station, Lt. Takets spoke with him privately outside. Later, Lt. Gutierrez shouted loudly from the officer's room "Lt. Stachura I'd like to see you in the officer's room." He then stated he had been assigned the truck and I the engine and "since when do you make a battalion chiefs decision and change the daily." I explained to him that in all my past experiences, the senior officer had the option of rigs. He stated he wanted to speak to a battalion chief and get his opinion. I said "fine" as he seemed determined to speak to the chief. I was confident in my position and told him to go ahead. During his conversation with Battalion Chief Keating, he was asked who had more seniority. Lt. Gutierrez replied, "she does". Battalion Chief Keating asked to speak with me. Battalion Chief Keating stated that he did not make out the staffing

sheet, he did not know how the decision was made, and as such, to just go with what was written. I had told him earlier there was not a staffing sheet at the station, only the daily. He said he would fax a copy of the staffing made by Chief Martin. I said that it was not necessary and I would move to the engine. As I was not feeling well, I did not question why he was not following seniority. Needless to say, I was not feeling well in the first place and at this point felt much worse. I called Chief Keating at 0735 and told him I was sick and needed to go home. Chief Keating said okay and that he was putting me out at 0730. I was always under the assumption that you should put a sick subordinate out at the nearest tenth of the hour. However, I did not question why I was being put out the previous tenth because at that point I was feeling nauseated. I was sick for two days with vomiting and diarrhea. After I went home, I realized that I would never have been able to work the entire shift and it was a mistake to try and go in.

On July 19, 1999, I was summoned to Chief John Coleman's office. I was totally shocked to find that a communication was written over the incident. I was also shocked that I should be summoned to Chief Coleman's office for this matter. For some reason, Battalion Chief Keating must have felt the need to document the incident. I have attached a copy of the communication to this communication. I have never heard of a

communication being written because an officer went home sick. At this point, I would like to point out some inaccuracies of the communication by Battalion Chief Keating. I did not give Battalion Chief Keating a reason for the change because he already knew of, and was aware of and disregarded the seniority issue when he asked Lt. Gutierrez who had more seniority. Why else would he ask who has seniority? Besides, he never asked why I made the change. I could have told him I was not feeling well, I had more seniority and a paramedic is a better choice for the engine. I did not report myself off with dispatch as he stated. However, the sick person should not have to wait around and report himself or herself off with dispatch. This is the immediate supervisor's duty. My immediate supervisor was Chief Keating. If Battalion Chief Keating wanted me to report off with dispatch because he was too busy to call, he could have told me when I reported sick. Finally, considering he put me out at 0730 and it was already past 0735, I was no longer the officer at the station, I was already on the sick list for five minutes.

After explaining the situation to Chief Coleman, I was told that the perception I gave was inappropriate. Well if perception is what counts, your office should be flooded with communications on over half the department. Chief Coleman was not able to explain to me why Battalion

Chief Keating wrote the communication. If this is the best shot they have of trying to get me, I guess I must be doing a pretty good job. This has to be one of the pettiest communications I have heard written. Does everyone receive a communication every time they go home sick? Why am I being singled out on this type of incident? I saw Battalion Chief Keating the next workday and he never mentioned the incident. He felt so strongly about the incident that he wrote a communications, but he did not have the nerve to discuss the incident with me? Chief Coleman then explained to me that if he were making the sheets, he would put me on the engine to give me experience and that Chief Martin was probably trying to help me. If Senior Battalion Martin believes I need additional experience, a mentor or what ever.... This was never conveyed to me.

Chief Bell, why do I need more experience? I've not heard that other officers with similar years on the job need this "experience"? Other Lieutenants promoted out of my class have not been told they need more experience. I have never been disciplined for mishandling any situation. I have been told countless times that I need more "experience". I do not understand that someone who has outbanded themselves finishing first on two promotional tests should need more experience than people who finished further down the list.

I do not understand why my seniority did not count in the incident described above. I understand this is an unwritten policy. However, what criteria, do battalion chiefs use when deciding when this seniority should apply? Is seniority just a tool to patronize the "good ole boy" system? Have you ever seen a communication written for somebody going home sick? Should I save vials of vomit for evidence in the future? When I come in and people ask me, "how am I doing?", should I reply that I have cramps, am nauseated and have diarrhea. How would saying this help anyone's perception of me?

I am very upset over this incident. I do not understand why Chief Keating thought it necessary to write a communication about an employee being sick. I asked Chief Coleman and he did not know why . . . Is this always done? Why, if Chief Keating was so displeased or had some concerns, did he not discuss them with me? Chief Coleman did not know why. I brought to Chief Coleman's attention that I have had several incidents where I could have written communications concerning inappropriate comments and actions by firefighters, officers and chief officers and never have. I've ignored, minimized and even covered for ridiculous, inappropriate behavior. It made me feel terrible that Chief Keating would write a communications. Chief Coleman said it was no big

deal, it would just go in my file. I do not want this incident in my file. I did not do anything inappropriate or violate any procedure. He later gave me his copy of the communications. I also told Chief Coleman that I resent the fact I was called to headquarters out of service with my crew. It was very awkward and embarrassing. He said he wanted to talk to me as a "friend" about the "perception". I did not feel I was treated as a friend. Chief Bell, at this point of my life, my physical wellbeing/ health takes higher precedence over "perception".

I never complained to you before or brought any situation to your attention. I appreciate you taking the time to read this communication.

{¶ 90} Before the start of the trial, appellees moved to exclude the exhibit on the grounds that it was replete with hearsay, and that it described appellant's view of the world, a matter that she could testify to at trial. Appellant responded that it was not hearsay, because the statements recounted by appellant were made by city employees within the scope of their employment. Furthermore, appellant argued that the exhibit was being offered to prove that a formal complaint was made to Chief Bell, and the fact that Chief Bell made no investigatory response to the complaint is evidence of gender discrimination.

{¶ 91} The trial court granted appellees' objection and excluded the exhibit without explanation. Furthermore, the court admonished appellant's counsel for even

45.

attempting to reference the existence of the letter during oral arguments. Later, during the trial, appellant attempted to testify to as to what Chief Keating told her, which was contained in the "Incident Documentation," but was unable to do so because the trial court sustained appellees' hearsay objection.

{¶ 92} Appellant, in her brief, argues that Exhibit 35 should have been admitted because it is "a tangible administrative complaint" about appellant's unfair treatment by Coleman. In addition, appellant asserts that Chief Bell's lack of response, and his belief that appellant was "faking sick," is evidence of a hostile work environment and retaliatory animus. Finally, appellant argues that the exhibit was offered to show appellant's protected act of opposing unlawful discrimination under R.C. 4112.02(I), which states, "It shall be an unlawful discriminatory practice: * * * (I) For any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code."

{¶ 93} Appellant also argues that Exhibit 35 is not hearsay simply because she quoted statements by Chief Keating and Lt. Gutierrez, since those statements were made by agents or employees of the defendant the City of Toledo, and concerned a matter within the scope of their employment, as allowed under Evid.R. 801(D)(2), which provides, "A statement is not hearsay if: * * * (2) The statement is offered against a

46.

party and is * * * (d) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship."

{¶ 94} Appellees, in response, argue that Exhibit 35 is hearsay, and that appellant has not established any exception under Evid.R. 803 or 804, focusing on the statements purportedly made by Gutierrez, Keating, and Coleman. Appellees also argue that the statements contained in Exhibit 35 are not admissions, and are not made by a party opponent, and thus do not constitute non-hearsay under Evid.R. 801(D)(2). Finally, appellees argue that Exhibit 35 was offered to prove the truth of the matters within it, and therefore constituted hearsay, which the trial court appropriately excluded.

{¶ 95} Upon review, we agree with appellant that the trial court erred when it excluded Exhibit 35. Complicating the analysis is the fact that Exhibit 35 was offered for two purposes. The first purpose was to prove the circumstances of the use of the sick day and the subsequent allegation of sick time abuse as evidence that appellant was treated differently because of her gender. As such, Exhibit 35 was offered to prove the truth of the matters asserted, and is subject to the hearsay analysis. Alternatively, the second purpose of Exhibit 35 was to prove that appellant made a complaint to Chief Bell about gender discrimination, with the intention of demonstrating that appellee engaged in protected activity for which appellees later retaliated against her, and that Chief Bell's lack of a response to the complaint is itself evidence of gender discrimination. For the

47.

second purpose, whether the allegations in the complaint are true or not is immaterial, it only matters that the complaint was made. Thus, for the second purpose, Exhibit 35 was not offered to prove the truth of the matters asserted, is not subject to the hearsay rules, and is admissible as relevant evidence.

{¶ 96} Where the same evidence is offered for a permissible purpose and an impermissible purpose, we find that the trial court should conduct a balancing test under Evid.R. 403(A), as it does with all pieces of evidence, and consider whether for the permissible purpose the "probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." "In order for the evidence to be deemed inadmissible under Evid.R. 403, its 'probative value must be minimal and the prejudice great.'" *State v. Sepeda*, 2020-Ohio-4167, 157 N.E.3d 889, ¶ 27 (6th Dist.), quoting *State v. Morales*, 32 Ohio St.3d 252, 258, 513 N.E.2d 267 (1987). "'When determining whether the relevance of evidence is outweighed by its prejudicial effects, the evidence is viewed in a light most favorable to the proponent, maximizing its probative value and minimizing any prejudicial effect to the party opposing admission.'" *Id.*, quoting *State v. Lakes*, 2d Dist. Montgomery No. 21490, 2007-Ohio-325, ¶ 20.

{¶ 97} Here, the trial court conducted no such analysis. Our view is that the probative value of Exhibit 35 is not substantially outweighed by the danger of unfair prejudice from admitting hearsay evidence, particularly where, although the exhibit itself is hearsay, appellant as the author of the exhibit could directly testify as to its contents.

48.

{¶ 98} As to the lack of danger of unfair prejudice from admitting hearsay evidence, we note that in the parties' discussion of hearsay, they do not address the fact that Exhibit 35 contains hearsay within hearsay in that Exhibit 35 is an out of court statement made by appellant recounting the statements of others, offered for the truth of the matters asserted. Thus, to be admissible under the hearsay rules, appellant must demonstrate that "each part of the combined statements conforms with an exception to the hearsay rule." Evid.R. 805. Here, however, appellant has argued no exception under Evid.R. 803 or 804 for her out of court statements that comprise Exhibit 35. Thus, to the extent that it is offered to prove the truth of the matters asserted, the letter itself is hearsay that does not fall within any exception.

{¶ 99} Rather than address the initial question of whether Exhibit 35 is itself hearsay, the parties focus on the hearsay within the hearsay, i.e., appellant's recounting of what Gutierrez, Keating, and Coleman said. Upon review, we find that the statements of Gutierrez, Keating, and Coleman are non-hearsay under Evid.R. 801(D)(2).

{¶ 100} Appellees argue against this conclusion, first perfunctorily concluding that the statements were not made by a party opponent. However, despite their conclusion, appellees do not argue that Gutierrez, Keating, and Coleman were not employees of the defendant the city of Toledo, nor do they argue that the statements were not made concerning a matter within the scope of the employment, facts which we find to be obvious from the record. Next, appellees assert that Evid.R. 801(D)(2) does not apply

because the statements are not "admissions." But, "[w]hile the term 'admission' appears to imply that the out-of-court statement must be a confession or statement against interest, in actuality, any prior statement of a party is admissible providing it is offered against the party at trial." *State v. Baker*, 137 Ohio App.3d 628, 652, 739 N.E.2d 819 (12th Dist.2000), quoting *Weissenberger's Ohio Evidence*, 367, Section 801.33 (1998). Finally, appellees argue that the statements should not be allowed because appellant could have been lying about what the declarants said, and the declarants were available to testify at trial if called. We find no merit to this argument, however, because as non-hearsay under Evid.R. 801(D)(2), the availability of the declarant is not material. Further, appellees' acknowledgment that the declarants were available to testify undercuts their concerns about appellant's truthfulness because appellee, the city of Toledo, could have called its own employees to testify regarding what they said. Any discrepancy between appellant's testimony and the declarants' testimony would then be resolved by the ordinary function of the trier of fact.

{¶ 101} Therefore, we hold that Exhibit 35 is not hearsay because it was not offered to prove the truth of the matter asserted, and any danger of unfair prejudice otherwise stemming from the hearsay nature of Exhibit 35 does not substantially outweigh its probative value. Therefore, we hold that the trial court erred when it excluded Exhibit 35 and prevented appellant from testifying as to its contents.

50.

### 3. Exhibit 39

{¶ 102} Appellant next argues that the trial court erred when it preemptively excluded Exhibit 39, which was Stachura's July 3, 2002 internal letter to Chief Bell. The exhibit states:

> This memo is respectfully submitted as a result of your request in our conversation on June 5, 2002. As you recall, in the June 5th conversation, you instructed me to complete this memo to your attention. Below is a brief outline as it relates to examples of incidents that have occurred between Deputy Chief Coleman and myself. I am available to provide more specific details, if necessary. While I am submitting this documentation at your request, I am reluctant due to past experience with the manner in which such issues have been handled with superiors through the appropriate channels. In the past, communications and/or conversations have resulted in retaliation as well as the proliferation of unfounded rumors within the department.

> One of the first incidents I had with Chief Coleman was several years ago. I was taking a fire science course at Owens Community College in which Chief Coleman was the instructor. A topic came up that was similar to a situation on the line involving keeping a crew together at an incident. I asked several questions in an attempt to tie my line experience

with his class instructions. Chief Coleman said he would like to discuss the situation after class. He appeared concerned and seemed to want to help. I was hesitant to bring names into the situation. I was merely looking for possible solutions. He absolutely assured me that the conversation would remain confidential. He insisted that he needed the names to know the "personalities" to get a better understanding. I told him of the situation with the names of the people. The main fire fighter involved was Rick Syroka. The next day, I was told by fellow fire fighters, that he called the crew into his office and told them what I said and that I was attempting to get them in trouble. Chief Coleman later told me that the commitment of confidentiality was not maintained and that he never intended to keep my confidence. His exact words were, "I lulled you into a false sense of security to get information from you." I understand that often it is not possible to maintain confidentiality as it relates to management issues. It would have been more appropriate for Chief Coleman to communicate that while he would try to maintain confidentiality, he could not guarantee it based on safety and/or management issues. I communicated issues to him in confidence seeking guidance.

By his own words and subsequent actions, he appears to never have [sic] any intentions on maintaining that confidence.

Soon after this incident, Chief Coleman approached me. In that meeting, he told me that it might be better if I was reassigned to the Training Bureau. I told him that I did not want to go to Training because I wanted and needed more experience on the line.

The controversial incidents cited that caused friction between me and some of the crews were the following: -*I had to order my crew back into service after a fire when one of the fire fighters wanted to stay and complain with other fire department members about how he had gotten into trouble for not shaking hands with the mayor. –I required a crew to wear their seat belts in the engine*. I was requiring my subordinates to be productive and follow the written rules and procedures of the department. Chief Coleman told me that maybe I was being too hard on the crews and that I should have looked the other way on the seatbelt issue. In this meeting Chief Coleman said I should worry about the perception that the crews have of me.

Another incident occurred while I was a lieutenant on 'B' Shift. I thought I was getting along very well with the crews on 'B' Shift. In fact, one of the 'B' shift stations frequently requested that I be the relief officer when their regular lieutenant was off. I liked working 'B' shift and wanted to continue working on that shift. Chief Coleman told me that I was being

moved to 'C' shift. I reminded Chief Coleman that I was not the lowest in seniority, as usually this action is done based on seniority. I told him I liked the shift and was getting along well with the crews. Chief Coleman moved me. While I did not like the move and strongly disagreed with it, I was told by Chief Coleman that it would be in my best interest not to grieve the move with the union. I interpreted this to mean that there would be repercussions on me and my opportunity for advancement if I pursued the issue. In an effort to try to keep a workable relationship with Chief Coleman, I did what he told me.

At a later date, as you may recall, a threatening/condescending letter was delivered to my house. I went to the administrative offices and made a formal complaint to Chief Coleman. I felt the letter was completely inappropriate and I would not tolerate this threatening action at my home. Chief Coleman assured me it would be investigated. He told me that he probably knew who did this. As you may also recall, Bob Krause had sent the letters. Bob Krause was promoted shortly thereafter while the investigation into his actions were currently under investigation. You indicated to me that you were not told of the complaint until shortly after Bob Krause was promoted. Apparently, it was more important for Chief Coleman to support his promotion, without your knowledge of the

"Investigation", than it was to resolve the unacceptable threatening behavior. As you are aware, the investigation revealed that Krause had sent letters to several minority lieutenants and senior lieutenants as well.

It was on "C" shift that I had the toughest time on the line as an officer. From conversations that I had with Chief Coleman, he knew it was likely that I would have a difficult time on "C" shift with Chief Martin and others. Chief Martin was the senior battalion chief on "C" shift. It was on "C" shift that I was given the most undesirable assignments. This appeared unusual because there were lieutenants with less seniority in rank. It is well known that the least desirable assignments go to the lieutenant with the least seniority. I was told that I was given the assignments to give me experience. However, when male acting lieutenants out of my class were assigned to the shift, I was still given the least desirable assignments.

This situation came to a head when I went home sick and was written up by Battalion Chief Keating for sick abuse. Without any investigation, approximately two weeks later, I was ordered to Chief Coleman's office with my crew. Chief Coleman implied that I feigned illness. I felt this was an attempt to sabotage my record. As I rarely used sick time, my attendance record was excellent. You may recall that I wrote you for intervention. The only other time that I requested your assistance.

You assigned Chief Walter to investigate the incident. Chief Walter agreed that there was not evidence of sick time abuse and removed Chief Keating's complaint from my file. From Chief Walter's investigation, he apparently agreed with my assessment of the intolerable situation I was in on "C" shift and it was mutually agreed it would be in my best interest to transfer me to Fire Prevention.

Another incident that indirectly involved Chief Coleman, who was in command of Operations and Internal Affairs, had to do with training required for all firefighters. All firefighters were required to pass entanglement training, "Saving you own". I took the training and passed the test easily. A short while after training, a lieutenant from training called me and stated that he wanted to let me know the rumor did not come from his group. I did not know what he and his group were talking about. I was told that a rumor was started that *the lieutenants in training said, that when I was at training, I could not pass the test after several attempts. The rumor went on to say I complained to Chief Bell and now all training is voluntary instead of mandatory so I would not have to go.* The lieutenants in Training made a complaint about the rumor because they knew it was not true and did not want to be associated with it. The investigation revealed that Rick Syroka orchestrated the rumor. The rumor had made it all around

the department.  The only punishment, to my knowledge, that Syroka received from the department was to give me an apology, which he did as he passed me in the hall.  Shortly thereafter, Syroka was promoted to Lieutenant.  Even though the rumor was widespread throughout the department, the department made no attempt to take corrective action on the rumor.  In my opinion, this should have been treated as an insubordination.  The crews on the line never found out that this was a false rumor.

This rumor and others of its kind continue and seem to take on a life of their own without any intervention from management.  As you recall, the study completed by the university about the fire department sited [sic] widespread talk on the line about a female who has been promoted due to testing scores.  Within this report there were derogatory comments sited [sic] about this female.  As you and the other leaders know, the female that individuals are referring to is me.  Most of the individuals making these statements do not know the facts and probably would not even know who I was if I shook their hand.  I consider the continuation of these rumors and the lack of any management action to quell them, as a position that management condones this harassment.

The following is a situation where my authority was challenged and the department failed to back me up. As you know, the FPB Captain assigns the parking spaces around Station One. Lt. Gutierrez, while coming to work, did not allow himself sufficient time to find a parking spot and parked in Brian Cook's parking spot. Brian Cook went to Communications and asked Lt. Gutierrez to move. After waiting quite awhile, Lt. Gutierrez did not move his vehicle. Brian Cook went to Lt. Gutierrez again about moving his vehicle. Words were exchanged. After a brief verbal confrontation, Brian Cook apologized. Lt. Gutierrez apologized back and moved his vehicle. A day later, Lt. Gutierrez wrote a communication on the incident. He wrote that the reason he pursued the matter was because he did not want himself or another officer to have to go through this again with Brian Cook. Personally, I thought the incident was settled with the apologies and should have been dropped. I was told that the department wanted to make an example of Brian Cook's disrespect to a superior officer. I realized that Gutierrez's parking against my written order was insubordination. I approached internal affairs about the total lack of respect of my authority in the matter. I was told by internal affairs that they would not address the issue and I would have to bring the matter up with Chief Coleman. I wrote a communications through my chain of command

58.

requesting an investigation on Lt. Gutierrez. After I wrote my communication, the entire incident was dropped. Why should Lt. Gutierrez's complaint of insubordination be important, but after my complaint of insubordination, the matter dropped?

The most recent incident involves the office situation. When I was told, in April, that I would be an acting battalion chief for an extended period, Chief Coleman asked if I would like to stay in the FPB Captain's office or go to the Battalion Chief's office. I chose the battalion chief office due to the location of the files among other personnel issues. Later, Dawn Clear, an administrative assistant complained that Chief Coleman had said that she could have that office. Chief Coleman told me that the decision was still mine and he backs his officers. The next day he told me that I would not be allowed to move to the Battalion Chief's office and anything that I moved there should be removed. He was moving Dawn Clear there. It appeared to me that he waited for me to make a decision and then did the exact opposite in an effort to further discredit me to my staff. If he wanted the administrative assistant to occupy the chief's office, why was I asked my preference? He assured me that the move was temporary for Dawn until they made a Battalion Chief. On June 5, 2002, Chief Coleman informed me that I would be moved from my captain's office. He

would be moving Battalion Chief Davis, the new chief, into my office. I was told that "You had two months of power and now it's time for you to move out of your office". I stated to Chief Coleman that I was not in the Battalion Chief's office and he said that I would be moving from the captain's office. It was not important for his administrative assistant to have an office near him when there was a male battalion chief. When I was acting battalion chief, I was not able to move into the battalion chief office. Now that the first female battalion chief has been appointed, she is required to move to a captain's office and the female captain is required to move, displacing a lieutenant to the administrative assistant's cubical. The captain of FPB had occupied this office for well over ten years. All other captains holding my position have been male.

While the office situation is a minor inconvenience, I truly believe that this action is not based on operational needs but rather Chief Coleman's desire to put me in my place and discredit me with my subordinates. I cannot challenge his argument that the Battalion Chief needs an office, notwithstanding his original commitment. I can and will make other arrangements for a workstation. However, I consider this harassing.

On 6/4/02, Chief Coleman said in front of me, "...with the drop program, there probably won't be any more captain's openings, it is unfortunate that Bob Krause will not be promoted off this list". Considering that Chief Coleman was involved with the incident involving Bob Krause and knew how I felt at that time, I felt his statement was made purposely to antagonize me. The statement he made has continued to bother me. Others who were part of the conversation noted the comment as well.

Chief Coleman approached me the morning after our conversation. Apparently, you had spoken to him. He told me that he was disappointed in me that I spoke with you and further stated, "Yesterday a line was drawn in the sand". I feel this statement is a threat and that further retaliation will most probably occur. I am very concerned that Chief Coleman will condone and promote an untenable and hostile work environment toward me. Although, I have felt this way for a number of years, the reason I originally requested the assignment to FPB was to get away from Chief Coleman and a hostile work environment.

I have had an excellent work record, and was promoted to lieutenant and, thereafter, promoted to captain. You had even advised me to take the upcoming chief exam. I have numerous letters and awards of my good

work in FPB on file. I have never received any formal discipline up to this point in my career, with the exception of the incident that was dismissed as baseless. I have been very successful in my current assignment until just recently when Chief Coleman was again assigned as my superior officer. I have worked for two other deputy chiefs and two different battalion chiefs in FPB without any incidents. I am requesting your immediate and personal intervention in this situation. If further retaliation against me in any way or through anyone occurs, I will be forced to take all appropriate action afforded to me.

I appreciate you taking the time to read this communication. I await your response and stand ready to provide you with any additional information upon request.

{¶ 103} As with Exhibit 35, appellees moved to exclude Exhibit 39 before the start of the trial on the basis of hearsay. Appellant argued that the Exhibit should be admitted as evidence to demonstrate that a complaint was made and the appellees failed to conduct any investigation upon it. Further, appellant argued that Exhibit 39 was not hearsay because the statements attributable to city employees are admissible under Evid.R. 801(D)(2). Finally, appellant argued that Exhibit 39 was admissible as a business record. The trial court rejected appellant's arguments, and found that Exhibit 39 was inadmissible hearsay. In reaching this conclusion, the trial court reasoned that "just

because someone is an employee of the City of Toledo does not make them an agent of the parties that are named Defendants in this case. There has to be some authority given to these people in order for them to become agents of the Defendants in this case."

{¶ 104} Furthermore, the trial court admonished appellant during opening arguments for attempting to state that appellant had reduced her descriptions of some incidents to writing. The court stated, in what we think is a fair representation of the many discussions concerning evidentiary issues between counsel and the court:

[Appellant's counsel]: * * * After a couple of months she had a conversation with Chief Bell, and in that private conversation Chief Bell asked if she was experiencing unfair treatment from Chief Coleman. She proceeded to respond affirmatively, yes, and described incidents. A few days later she put that description into writing.

[Appellee's counsel #1]: Your Honor –

THE COURT: Sustained.

[Appellant's counsel]: Take exception, Your Honor.

[Appellee's counsel #2]: What's the exception based on?

[Appellant's counsel]: I'm talking about a writing that was created, I'm not trying to admit it.

[Appellee's counsel #1]: Your Honor, may we -- I hate to do it during opening but –

63.

THE COURT: Approach

(Whereupon, a bench discussion was held as follows.)

[Appellee's counsel #1]: Your Honor, the whole objecting during opening – in fact, until this case I never have. But he is now reciting in his opening the exact documents and the exact hearsay that we just spent a half-hour, 45 minutes saying are not coming into evidence. He can't use opening to recite evidence that is not going to be in the case.

[Appellant's counsel]: I believe Your Honor has already ruled and we take exception.

THE COURT: Well, I know you take exception and you don't want to abide by my rulings, but your exception is so noted, and stop referring to stuff that you know is not going to be admitted. I think it's highly improper for you to do that.

[Appellant's counsel]: Your Honor, we can, certainly, allude to the existence of a writing. I'm not bringing in the contents of it.

THE COURT: But I will tell you, though, he's held to what he says in opening, and if he doesn't do it, if he doesn't produce it --

[Appellee's counsel #1]: Your Honor, I know that --

THE COURT: You know, Terry --

[Appellee's counsel #1]: it's just improper.

THE COURT: -- it is improper. Why would you even do that? Why would you mention something that you know is not going to be admitted?

[Appellant's counsel]: She's going to testify that she reduced her complaints to writing. I mean, we're not admitting -- I'm not going to have her identify the writing, based on the Court's ruling, but we can certainly allude to the fact that it was done.

[Appellee's counsel #1]: Well, what good is it to go through the exercise --

THE COURT: I know.

[Appellee's counsel #1]: -- we just went through when he's getting it in in a different way?

[Appellant's counsel]: I am not getting it in in a different way.

THE COURT: Well, he's not getting it in.

[Appellant's counsel]: No.

THE COURT: He's just stating it.

[Appellee's counsel #1]: But they are hearing it, they're getting it to the jury.

THE COURT: Well, but I've also explained to them that what you guys say isn't evidence.

[Appellant's counsel]: Right.

[Appellee's counsel #1]: May I just add, briefly, I would like to -- I think it's proper for us to move for a mistrial at this point. The Court specifically directed that the evidence he's using in opening not be introduced into this court and he's doing it anyway and that's, clearly, against the Court's direct order and it's, clearly, against any known ethical or professional consideration. What you're doing is wrong. She told you not to do it and you're doing it anyway.

THE COURT: Well, your request for mistrial will be denied, we're not doing this again.

{¶ 105} On appeal, appellant argues that Exhibit 39 is admissible for the same reasons as Exhibit 35. Likewise, appellees argue that Exhibit 39 should be excluded for the same reasons as Exhibit 35. In light of our analysis above, we hold that the trial court erred when it excluded Exhibit 39 on the basis of hearsay. Exhibit 39 is admissible not for the truth of the matters asserted, but rather to show that a complaint was made to Chief Bell and was not acted upon.

{¶ 106} Moreover, we find that the trial court erred in its hearsay reasoning. The court excluded Exhibit 39 because the city employees were not "agents" of appellee, the City of Toledo. However, Evid.R. 801(D)(2) applies to both a party's "agent *or servant* concerning a matter within the scope of the agency *or employment*, made during the

existence of the relationship." (Emphasis added). *See Fuller v. Anchor Pointe Marina*, 2017-Ohio-8921, 100 N.E.3d 1281, ¶ 23 (6th Dist.) (statements are non-hearsay under Evid.R. 801(D)(2) where they were made by employees, while acting on behalf of the defendant, and regarding a matter within the scope of the employment). Here, as with Exhibit 35, the declarants in Exhibit 39 are employees of the city of Toledo, and the statements were made within the scope of their employment. Thus, the statements of the declarants contained in Exhibit 39 are non-hearsay under Evid.R. 801(D)(2).[2]

### 4. Exhibit 94

{¶ 107} Appellant next argues that the trial court erred when it excluded Exhibit 94, which was an anonymous letter that appellant received at her home a few months after the incident with Coleman while he was an instructor at Owens Community College. The letter was dated June 13, 1998, and stated:

BIDDING TO THE ALARM OFFICE

You have the opportunity to bid to the Alarm Office. You should do
it. I think this would be a good opportunity for you to reduce some
pressure you may be feeling. The schedule would remain the same (24 on
48 off,) you would no longer have to get up in the middle of the night, be

---

[2] This does not alter the fact that, like Exhibit 35, Exhibit 39 is itself hearsay because it is an out of court statement made by appellant, and does not fall within any exception under Evid.R. 803 or 804. Notably, appellant briefly argues on appeal that Exhibit 39 is a business record under Evid.R. 803(6), but appellant did not make that argument in the trial court and no evidence was adduced to support such an argument.

cold, wet or over heated.  You would almost completely eliminate any possibility of getting seriously injured.  There is also ample opportunity for overtime.

You would still have command responsibilities, and be required to make critical decisions.  You possess a fine speaking voice, you're articulate and present yourself in a professional manner.  This position may present you with the chance of using some of the other skills that you possess.  Additionally, with the possibility of taking the Captains exam, you would have an excellent opportunity to study in the A/O.

Give this suggestion serious consideration, the bid will be available very soon, look for it, or call Lt. Dauer.

Sincerely,

Your friend

{¶ 108} The trial court excluded Exhibit 94 because it was an anonymous letter and therefore was hearsay.  The trial court further admonished appellant when she tried to testify about what she did in response to receiving the letter.  Appellant proffered that based on facts revealed during discovery, Coleman knew who authored the letter, and that Coleman purposely did not take action against the author until after the author had been promoted.  Appellant argued unsuccessfully that this was evidence of unequal treatment based on gender.

**{¶ 109}** Having reviewed Exhibit 94, we find that it was not offered for the truth of the matter asserted in the letter, and thus is not hearsay. The letter asserts that there was an upcoming opportunity in the Alarm Office, and that appellant should consider it. Whether there was, in fact, an upcoming opportunity in the Alarm Office is not pertinent to the issues at trial, but it is relevant that she received such a letter during the time that she was a new lieutenant on the line and after she reported to Coleman some difficulties with the firefighters under her command. We think it is fair to infer from the letter and the circumstances surrounding it that the author did not like appellant's performance as a lieutenant and wanted to see her leave. Furthermore, Coleman's response to appellant receiving the letter, and Coleman's treatment of the author, is relevant to the issue of whether there was disparate treatment based on gender.

**{¶ 110}** Therefore, we hold that the trial court erred when it excluded Exhibit 94.

### 5.  Exhibit 55

**{¶ 111}** The fourth exhibit that appellant asserts should have been entered into evidence is Exhibit 55, which is a grievance that she filed against the fire department regarding the denial of her use of vacation time. Included with the "Official Grievance Form," was a narrative from appellant written in the third person that stated:

> Captain Carla Stachura submitted her vacation request for 2006 to her immediate supervisor, Battalion Chief Dennis Facer, on January 19th, 2006. Battalion Chief Facer approved her vacation on January 24th, 2006.

69.

(see attached e-mail). On March 9th, 2006, Captain Stachura was told her vacation had been <u>rescinded</u>. The reason for the denial of Captain's [sic] Stachura's vacation had no merit and had nothing to do with vacation selection procedure. Captain Stachura has utilized vacation in a similar manner in the past without objection.

Chief Coleman explained to Stachura that Chief Bell stated "why do I need her if she can get her work done in 3 or 4 days?" Stachura stated that there is an acting officer when she is off. Coleman then implied Stachura was taking off when monthly reports are due. Stachura explained that was false, as weekly reports are due on Thursday and monthly reports are completed by the 8th of each month. Vacation usage would not require the acting officer to complete her work.

Coleman explained vacations can be taken in 5 day blocks and 5 days can be kept in reserve for individual use. Stachura asked for written clarification of the new policy as she would need to explain the changes to her subordinates. Coleman stated that next year, Stachura should not submit all of her vacation at once. Stachura explained, it was her understanding that this was correct [sic] method as opposed to sporadically submitting vacation requests. Coleman stated that the rule changed 2 to 3

years ago. Chief Coleman stated it was his understanding that Chief Bell would not put the policy in writing.

Apparently, this policy only applies to Stachura. Stachura explained that many members in FPB have already used 5 individual days. Should she deny further vacation time if not taken in a 5 day block? Coleman didn't seem concerned about other people's vacation. Stachura cited Larry Hunter as an example who, during bowling season takes Wednesday's [sic] off. Chief Coleman said he wouldn't do that to Larry because he has respect for Larry. Stachura also cited Marc Edwards who was taking that Friday and Monday off. Chief Coleman stated it was funny because he (Coleman) was using 3 days vacation the following week and he had no intention of changing his own vacation. Stachura pointed out several other bureau members who did not take their vacation in five day blocks. Coleman stated they would still be allowed to do so.

Coleman stated Bell did not approve of the repetitive pattern of her vacation. Coleman stated that they understand that she likes [sic] use vacation with her husband but, she should "just stay home with the dogs and cats for some of that time". (Captain Hickey was present when this suggestion was provided.)

Stachura consulted Lt. Dauer as to the policy. Dauer stated, "staff utilize vacation in hours not days".

Argument:

The labor agreement between Local #92 and the City of Toledo states in Section 2125.78, "Employees shall be allowed to schedule and take vacations and Kelly Days provided herein in accordance with existing Departmental procedures agreed upon between the City and the Union." There are no current procedures for vacation usage for staff personnel. Therefore, past practice must be used to determine existing procedures. Considering, Captain Stachura is requesting to use her vacation in the same manner as in past years, there were no vacation conflicts within her bureau, and her vacation was approved in January 2006, the Chief cannot arbitrarily change vacation procedures without negotiating with Local #92.

The City is also in violation of Section 2125.10 Pledge Against Discrimination and Coercion, "The provisions of this Title of the Code shall be applied to all members of the bargaining unit, without discrimination as to age, sex, marital status, race, color, creed, national origin, sexual orientation or political affiliation. The failure of the City to apply this Agreement, without such discrimination, shall be subject to the

provisions of the grievance procedure." The city is not administering it's (sic) vacation policy fairly and equally among members of this department.

Resolution:

Captain Stachura's vacation approved on January 24th, 2006 be re-approved. If Captain Stachura's vacation is not re-approved before the resolution of this grievance, then everyday [sic] that was scheduled vacation that she is forced to work will be paid at time-and-one-half and she will still be able to use the vacation day later in the year.

{¶ 112} At the trial, appellant offered this exhibit both to demonstrate as direct evidence that Chief Coleman retaliated against her in another act of maintaining a hostile work environment, and also to demonstrate that appellant engaged in the protected activity of opposing discriminatory activity. Appellees opposed the exhibit on the grounds that it was hearsay and an attempt by appellant to explain what she thinks other people are thinking. Further, appellees argued that there was no indication that it was a document that would be kept in the regular course of business.

{¶ 113} Initially, the trial court allowed Exhibit 55 to be entered, although it believed "it's somewhat misleading." After discussing the next exhibit, appellees moved back to Exhibit 55, and informed the court that they would be objecting to any testimony by appellant about what she thinks Coleman might have said to other people referenced in the exhibit such as Larry Hunter or Lt. Dauer. Appellees reiterated that Exhibit 55 was

73.

appellant's opinion of what Coleman's thought processes were, and was thus improper. Further, they added that the exhibit was hearsay containing hearsay. Before being directed to the offending statements, the court commented, "Oh, yes, I see that right in the first sentence. * * * All right. I was looking further on down -- in the explanation. So yes, it is hearsay so I am going to revise my previous ruling and not allow 55."

{¶ 114} On appeal, appellant argues that the exhibit should have been admitted to prove her opposition to unfair gender and retaliation discrimination, and also to prove that she was the only person in the department denied the option of using her vacation time in small blocks.

{¶ 115} For the latter purpose, Exhibit 55 is inadmissible as hearsay because it is being offered to prove the truth of the matter asserted, and because appellant has not demonstrated that it falls within any of the exceptions in Evid.R. 803 or 804. Notably, it appears that the exhibit may be admissible as a business record under Evid.R. 803(6), but appellant did not offer any testimony from a custodian or other qualified person that the grievance was made and kept as part of a regularly conducted business activity.

{¶ 116} For the former purpose, however, Exhibit 55 is not being offered to prove the truth of the matters asserted, but rather to show that she opposed what she perceived to be an unlawful discriminatory practice. Thus, Exhibit 55 should have been admitted by the trial court.

74.

{¶ 117} In addition, as with Exhibit 39, we find that the trial court erred with its expressed hearsay reasoning. Contrary to appellees' characterization at trial, Exhibit 55 does not contain any instances of appellant relaying what Coleman stated to someone else. In Exhibit 55, appellant only describes the statements that Coleman made to her. All of the statements from Coleman are made directly to appellant. Moreover, we are puzzled by the court's declaration that there is hearsay within hearsay in the first sentence, since the first sentence of the exhibit simply recounts that appellant submitted her vacation request to Battalion Chief Facer in January 2006. In the first sentence of the second paragraph, appellant recounts what Coleman told her that Chief Bell told him, which was "why do I need her if she can get her work done in 3 or 4 days?" However, neither of those statements are hearsay because they are admissions of a party opponent under Evid.R. 801(D)(2).

{¶ 118} Therefore, we hold that the trial court erred in excluding Exhibit 55.

### 6. Exhibit 58

{¶ 119} The last exhibit that appellant argues the trial court improperly excluded is Exhibit 58, which is an interoffice memorandum from Captain James Martin, the President of Local 92, and an attached petition that was circulated amongst the firefighters. The memo stated,

> This memo is to inform everyone that three petitions are being
>
> circulated on behalf of Local 92. It is our belief that these petitions will be

75.

beneficial with Local 92's defense of three members who were wrongfully terminated. We ask that you carefully read the statement at the top of each petition and if you are in agreement with the statement please sign and print you're [sic] name on the petition.

The attached petition form was titled "Vote of Confidence" and stated,

I, the undersigned, am fully aware of the circumstances leading to the termination of Firefighter Stachura. In my opinion, the alleged conduct (tape recording) in no way erodes my confidence nor trust in her ability to lead firefighters. I would have no problem working alongside Capt. Stachura in the event she is reinstated. I do not believe that the alleged conduct that led to her termination would in any way effectively preclude her from building a cohesive unit that leads each team or fire company.

The petition form contains approximately 70 signatures.

{¶ 120} Early in the trial, appellees objected to the exhibit on the grounds that the exhibit is not relevant and that it is highly prejudicial. Additionally, appellees argued that the petition contained hearsay statements. The court excluded the exhibit on the grounds that appellant did not offer Jim Martin to lay the foundation for the exhibit, and that the exhibit was hearsay from all of the signatories.

{¶ 121} Later, after Captain Sharyl Close testified and identified the petition and her signature on it, appellant again moved for its admission. Appellees renewed their

opposition to the exhibit, asserting both hearsay and authentication objections. Appellant argued that Close had authenticated the exhibit, but the trial court disagreed.

{¶ 122} On appeal, appellant argues that the court erred in excluding the exhibit because it was not offered for the truth of the matters asserted, but rather was being offered to demonstrate appellant's efforts to gather proof that she would not be rejected by mistrustful coworkers if reinstated. Appellees counter by arguing that the petition is hearsay, that it was not properly authenticated, and that it is not relevant.

{¶ 123} Starting with the issue of authenticity, we find that the petition was properly authenticated. Evid.R. 901(A) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Here, Exhibit 58 was handed to Close, who testified that she was "at Station 14 with three other men that were friends with the person that was bringing that around, and so I did sign it." Close also identified her signature on line 11 of the petition. We hold that Close's testimony is sufficient to support a finding that Exhibit 58 was the petition that she signed, and thus was authenticated, and the trial court's failure to so find was an abuse of discretion.

{¶ 124} Turning to the questions of hearsay and relevancy, we hold that Exhibit 58 is not hearsay because it was not offered to prove the truth of the matters asserted, but rather was relevant as evidence that appellees' stated reason for terminating appellant was

77.

pretext.  Specifically, it is not material whether each signatory of Exhibit 58 actually believes that appellant's secret tape recording would have no impact on his or her ability to work alongside appellant.  It is relevant, however, that such a petition existed. Appellees cited a lack of trust as its reason for terminating appellant's employment.  That reason is called into question, though, where appellees received a petition from 70 firefighters that indicated they could trust appellant.

{¶ 125} Therefore, we hold that the trial court erred in excluding Exhibit 58.

### 7.  Effect of Exclusion

{¶ 126} Having found error relative to the exclusion of the exhibits, we next consider appellant's argument that exclusion of this evidence was clearly "inconsistent with substantial justice."  Civ.R. 61.  As previously addressed, the excluded exhibits contained probative and relevant evidence regarding the appellees' treatment of appellant as well as evidence that might support appellant's claims of pretext for termination and retaliation.  In excluding this evidence, the trial court prevented appellant from presenting this evidence as part of her case.  Where excluded evidence is potentially key evidence, that exclusion is unduly prejudicial and necessitates a new trial.  *See, e.g., Johnson v. Emergency Physicians of Northwest Ohio at Toledo, Inc.,* 2013-Ohio-322, 986 N.E.2d 595, ¶ 23-24 (6th Dist.) (exclusion of testimony denied appellant meaningful opportunity to cross-examine witness regarding key issues).  Accordingly, the trial court's decision as

78.

to the exhibits affected appellant's substantive rights, and reversal is appropriate due to the trial court's error.

## 8. Conclusion

{¶ 127} For all the reasons discussed above, we hold that the trial court erred in excluding the referenced exhibits, affecting appellant's substantive rights. Accordingly, appellant's first assignment of error is well-taken.

## B. Jury Instructions

{¶ 128} In her second assignment of error, appellant argues that the trial court committed two separate errors in its jury instructions.

{¶ 129} "A trial court is obligated to provide jury instructions that correctly and completely state the law." *Cromer v. Children's Hosp. Med. Ctr. of Akron*, 142 Ohio St.3d 257, 2015-Ohio-229, 29 N.E.3d 921, ¶ 22, citing *Sharp v. Norfolk & W. Ry. Co.*, 72 Ohio St.3d 307, 312, 649 N.E.2d 1219 (1995). "The jury instructions must also be warranted by the evidence presented in a case." *Id.*, citing *Estate of Hall v. Akron Gen. Med. Ctr.*, 125 Ohio St.3d 300, 2010-Ohio-1041, 927 N.E.2d 1112, ¶ 26. "The question of whether a jury instruction is legally correct and factually warranted is subject to de novo review." *Id.*

{¶ 130} Where a trial court errs in charging the jury, that error "does not inevitably constitute reversible error." *Id.* at ¶ 35, citing *Becker v. Lake Cty. Mem. Hosp. W.*, 53 Ohio St.3d 202, 208, 560 N.E.2d 165 (1990). "The general rule is that an

79.

erroneous instruction does not necessarily mislead a jury." (Citation omitted.) *Id.* at ¶ 36. Instead, to merit reversal, it must be shown that the error prejudiced a party's substantial rights. *Id.* at ¶ 35.

## 1. Hostile Work Environment

{¶ 131} Appellant first claims that the trial court erred when it failed to include the "Sexual harassment - hostile work environment" jury instruction contained in OJI CV 533.17, and in particular when it failed to include the provisions that the evidence must be viewed from the point of view of a reasonable person in the same or similar circumstances.

{¶ 132} OJI CV 533.17 provides, in pertinent part, the instruction:

1. GENERAL. The employee claims that he/she has been subjected to a hostile work environment because of sexual harassment. To establish a claim of hostile work environment sexual harassment, the employee must prove by the greater weight of the evidence that he/she was sexually harassed and that the sexual harassment was so severe or (pervasive) (extensive) that it permeated the work environment and altered the conditions of the employee's employment.

2. SEXUAL HARASSMENT. "Sexual harassment" means unwelcome sexual advances, unwelcome requests for sexual favors, or other unwelcome verbal or physical conduct of a sexual nature.

{¶ 133} Here, as recognized by the trial court, the record contains no evidence that appellant was subjected to unwelcome sexual advances, unwelcome requests for sexual favors, or other unwelcome verbal or physical conduct of a sexual nature. Therefore, we hold that the "Sexual harassment - hostile work environment" instruction was not warranted by the evidence, and the trial court did not err in failing to give that instruction.

## 2. Retaliation

{¶ 134} Appellant next claims that the trial court erred in its instruction on retaliation. The trial court instructed the jury as follows:

Retaliation: Defendant City of Toledo may not retaliate against Plaintiffs Stachura and Imhoff, who have opposed an unlawful discriminatory practice, filed a lawsuit or participated in any manner in a proceeding or hearing concerning discrimination. Plaintiffs Stachura and Imhoff must prove by the greater weight of the evidence that Defendant City of Toledo intended to retaliate when it terminated them and/or changed their job requirements. Plaintiffs Stachura and Imhoff need not prove that the sole purpose of their termination and/or changed job requirements was retaliation. It is sufficient that Plaintiffs Stachura and Imhoff prove that retaliation was a determining factor in the termination and/or changed job requirements. Determining factor means that Plaintiffs Stachura and Imhoff's opposition to unlawful discriminatory practices,

81.

filing a lawsuit or participation in any manner in a proceeding, lawsuit or hearing concerning discrimination made a difference in the termination and/or change of job requirements. There may be more than one reason for the Defendant City of Toledo's decision to terminate Plaintiffs Stachura and Imhoff and/or change their job requirements. Plaintiffs Stachura and Imhoff need not prove that their opposition to unlawful discriminatory practices, filing a lawsuit or participation in any manner in a proceeding, lawsuit or hearing concerning discrimination was the only reason. It is not a determining factor if Plaintiffs Stachura and Imhoff would have been terminated and/or had their job requirements changed regardless of their opposition to unlawful discriminatory practices, filing a lawsuit or participation in any manner in a proceeding, lawsuit or hearing concerning discrimination. Plaintiffs Stachura and Imhoff must have a reasonable belief that Defendant City of Toledo engaged in a discriminatory employment practice before Plaintiffs Stachura and Imhoff opposed unlawful discriminatory practices, filing a lawsuit or participation in any manner in a proceeding, lawsuit or hearing concerning discrimination, whether or not Defendant City of Toledo did, in fact, engage in a discriminatory employment practice. The issue is not whether Defendant City of Toledo actually engaged in a discriminatory employment practice.

Reasonable belief means that belief which would be held by a reasonably careful person under the same or similar circumstances. When considering whether their termination was retaliatory conduct or not you may consider how much time elapsed between the filing of the original lawsuit and their termination. In this case the original lawsuit was filed in November 2005, and the Plaintiffs, Stachura and Imhoff, were terminated on January 31st, 2007.

* * *

Protected activities: Protected activities include opposing any unlawful discriminatory practice or making a charge of discrimination or testifying, assisting or otherwise participating in any manner in one's own or someone else's charge of discrimination, investigation, proceeding or hearing under Ohio Revised Code 4112. Surreptitious taping is not a protected activity.

{¶ 135} Appellant argues that the court erred when it included the paragraph instructing the jury that when it considered whether the termination was retaliatory conduct, it could consider how much time elapsed between the filing of the original lawsuit and the termination, and then identified that the lawsuit was filed in November 2005, and appellant was terminated on January 31, 2007. Appellant argues that the instruction unduly highlighted a 14-month passage of time between the filing of the suit

and the finalization of appellant's termination, but the record showed that appellant was suspended and investigated beginning approximately six months after filing the lawsuit. Appellees respond that the charge was appropriate because the temporal proximity helped to show, or not show, the city's motivation for retaliation.

{¶ 136} Upon review of the record, we find that the trial court's instruction was not appropriate based upon the evidence presented. Here, the evidence presented by appellant's testimony was that she was suspended in May 2006, that a hearing was held, and she was ultimately terminated in January 2007. Although the termination was not finalized until January 2007, appellant was effectively removed from her employment in May 2006. Furthermore, the trial court's instruction improperly limits the jury's focus on the retaliation claim solely to appellant's termination, and discounts other adverse employment actions. Therefore, we hold that the trial court erred when it instructed the jury to consider that appellant filed the lawsuit in November 2005, but was not terminated until January 2007.

{¶ 137} Appellant also argues that the trial court erred when it instructed the jury that surreptitious tape recording was not a protected activity. R.C. 4112.02(I) says that it is an unlawful discriminatory practice for any person to discriminate against any other person "because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in

any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code."

{¶ 138} In support of her contention that surreptitious tape recording is a protected activity, appellant cites three federal decisions, none of which deal directly with the issue before us.[3]

{¶ 139} In *Heller v. Champion Intl. Corp.*, 891 F.2d 432 (2d Cir.1989), the court reversed the trial court's granting of judgment n.o.v. on an employment breach of contract claim. In dicta, the Second Circuit highlighted a broad interpretation of the anti-discrimination statute that prevented retaliation where the individual "participated *in any manner* in an investigation, proceeding, or litigation under this chapter." (Emphasis sic.) *Id.* at 436. The court then concluded that tape recording the conversations was not necessarily the kind of disloyalty that would warrant dismissal where the employee believed that he was being discriminated against because of his age. *Id.*

{¶ 140} The other two decisions, *Opryland Hotel*, 323 NLRB 723 (May 15, 1997) and *Stephens Media, LLC*, 356 NLRB 661 (Feb. 14, 2011), are decisions from the National Labor Relations Board that pertain to unfair labor practices for interfering with, restraining, or coercing employees in the exercise of their rights to organize and

---

[3] "For retaliation claims in Ohio, 'Federal law provides the applicable analysis for reviewing retaliation claims.'" *Baker v. The Buschman Co.*, 127 Ohio App.3d 561, 568, 713 N.E.2d 487 (12th Dist.1998), quoting *Wright v. Petroleum Helicopters, Inc.*, 8th Dist. Cuyahoga No. 71168, 1997 WL 578939 (Sept. 18, 1997).

collectively bargain, and their right to self-organize, form, join, or assist labor organizations.

{¶ 141} In contrast, appellees cite *Argyropoulos v. Alton*, 539 F.3d 724 (7th Cir.2008), in which the employee argued that she was engaging in a protected activity because she secretly recorded the meeting with her superiors to obtain evidence of discrimination. In rejecting that argument, the Seventh Circuit held, "[a]lthough Title VII indubitably protects an employee who complains of discrimination * * * the statute does not grant the aggrieved employee a license to engage in dubious self-help tactics or workplace espionage in order to gather evidence of discrimination." *Id.* at 733-734. Thus, the court concluded that the employer's admission that the surreptitious recording was a significant factor in the employee's dismissal was not direct evidence of retaliation. *Id.* at 734.

{¶ 142} Upon review of the arguments presented to us, we find that only *Argyropoulos* is on point for the issue of whether surreptitious tape recording is a protected activity for an employment discrimination retaliation claim. We therefore follow the reasoning in *Argyropoulos*, and hold that surreptitious tape recording is not a protected activity for purposes of R.C. 4112.02(I).[4]

---

[4] At least one other Ohio court has expressed skepticism that surreptitious tape recording is a protected activity. *See Davenport v. Big Brothers & Big Sisters of Greater Miami Valley, Inc.*, 2d Dist. Montgomery No. 23659, 2010-Ohio-2503, ¶ 55, fn. 8 ("Parenthetically, we harbor doubts about whether Davenport's acts of contacting Parks about the school-enrollment issue, tape recording a staff meeting, and failing to attend a sex-toy party qualify as 'protected activities.'").

### 3. Effect of Improper Instruction

{¶ 143} Having determined that the trial court improperly framed the jury instruction relative to the retaliation claim, we must next consider the effect of this error on the trial. More specifically, we must consider "'the jury charge as a whole and "must determine whether the jury charge probably misled the jury in a matter materially affecting the complaining party's substantial rights."'" *Cromer,* 142 Ohio St.3d 257, 2015-Ohio-229, 29 N.E.3d 921 at ¶ 35, quoting *Kokitka v. Ford Motor Co.,* 73 Ohio St.3d 89, 93, 652 N.E.2d 671 (1995), quoting *Becker,* 53 Ohio St.3d at 208, 560 N.E.2d 165.

{¶ 144} Here, we found that the trial court's retaliation instruction, as given to the jury, improperly limits the jury's focus on the retaliation claim solely to appellant's termination, and discounts other adverse employment actions. The erroneous jury instruction, therefore, resulted in substantial prejudice to appellant.

### 4. Conclusion

{¶ 145} Accordingly, appellant's second assignment of error is well-taken only to the extent that the trial court erred in instructing the jury to consider that appellant filed the lawsuit in November 2005, but that she was not terminated until January 2007.

## C. Directed Verdict

{¶ 146} In her third assignment of error, appellant argues that the trial court erred when it directed a verdict in favor of the four individual appellees on the basis of statutory immunity.

{¶ 147} A decision to grant or deny a motion for a directed verdict under Civ.R. 50(A)(4) is a question of law that we review de novo. *Rieger v. Giant Eagle, Inc.*, 157 Ohio St.3d 512, 2019-Ohio-3745, 138 N.E.3d 1121, ¶ 8. Civ.R. 50(A)(4) provides that when the court "after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."

{¶ 148} Here, the trial court granted a directed verdict to the individual appellees on the grounds that they were entitled to immunity under R.C. 2744.03(A)(6)(b). R.C. 2744.03(A)(6)(b) provides that a political subdivision employee is immune from liability unless "[t]he employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." The trial court found in this case that "there has been no evidence that [the individual appellees] acted maliciously, in bad faith or with any wanton misconduct or even recklessness in this matter." "While a political subdivision employee's entitlement to immunity is ordinarily a question of law, whether there exists

malice, bad faith, and wanton or reckless behavior are generally questions of fact to be resolved by the jury." *Spitulski v. Bd. of Edn. of Toledo City School Dist.*, 2017-Ohio-2692, 90 N.E.3d 287, ¶ 23 (6th Dist.).

{¶ 149} Interestingly, this question has been addressed and resolved several times before in this litigation. On February 24, 2012, the trial court denied appellees' motion for partial summary judgment, finding that genuine issues of material fact remained as to whether the individual appellees acted manifestly outside the scope of their employment, or acted with malicious purpose, in bad faith, or in a wanton or reckless manner. We affirmed that decision in *Stachura v. Toledo*, 6th Dist. Lucas No. L-12-1068, 2013-Ohio-2365, ¶ 14 ("*Stachura II*"), holding that "a genuine issue of material fact remains in dispute for jury determination regarding whether the conduct at issue by appellants directed towards appellees during their employment at TFD constitutes conduct of malice, bad faith or recklessness by appellants such that the R.C. 2744.03(A)(6)(b) exception to immunity applies to any or all of the individual appellants in this matter." The trial court revisited the issue on December 2, 2016, and again held that summary judgment was not appropriate for appellees on the basis of immunity. In *Stachura v. Toledo*, 6th Dist. Lucas Nos. L-16-1310, L-16-1315, L-16-1316, 2017-Ohio-8772, ¶ 16 ("*Stachura III*"), we affirmed, holding "The record reflects that there are remaining genuine issues of material fact that a jury must decide in this case regarding whether appellants acted with malice, in bad faith, or so recklessly in their employment treatment

of appellees that their conduct would fall within the immunity exceptions established by R.C. 2744.03(A)(6)(b)."

{¶ 150} We have reviewed the trial transcript, and have compared it to the evidence presented in the parties' earlier briefs and oppositions to summary judgment, and find that the evidence is of functionally the same content and character, if not more robust from the trial. Furthermore, construing the evidence adduced at trial in appellant's favor, a question of fact remains that must be resolved by the jury as to whether the individual appellees acted with malice, in bad faith, or in a reckless manner. Therefore, we hold that the trial court erred when it entered a directed verdict in favor of the individual appellees.

{¶ 151} Accordingly, appellant's third assignment of error is well-taken.

### D. Economics Expert

{¶ 152} In her fourth assignment of error, appellant argues that the trial court erred when it did not allow her to call her economics expert, James Matthews, to testify by video deposition. Appellant argued in the trial court that she was constructively discharged from her employment, and that Matthews would have testified to her damages from lost wages. Appellees opposed Matthews testifying because appellant had not presented any expert evidence to show that she retired for any reason other than disability. Notably, during appellant's testimony, she testified that she received notice that she had exhausted her time on limited duty, and would be taken off of payroll on

90.

October 1, 2008. In response to that notice, appellant applied for disability "[b]ecause I had realized that all of my options on the Fire Department was over, I was not going back to my bid position, I would not be able to be a Battalion Chief, the reason that I was terminated was because it would be too unsafe for me to work on the line." Appellant further explained that she did not want to leave the Fire Department, but she felt like she had no other options.

{¶ 153} After hearing the parties' arguments, the trial court agreed with appellees and prevented appellant from calling Matthews. The court reasoned, "You need some expert to say, this is why she had to retire. Whether it was Trudy Bond to say she was so depressed that she had to retire, she couldn't function any more, or Kaffen that said her back was out, she had to retire. * * * So I don't see how this testimony comes in."

{¶ 154} Appellant argues on appeal that the trial court misunderstood the requirements to prove constructive discharge, and thus erred when it refused to allow appellant's expert witness.[5] Appellees counter that to be entitled to future lost wages—which ostensibly would have been the subject of Matthews' testimony—appellant must first offer evidence that her prospective wage loss was the result of appellees' conduct. In that light, appellees argue that appellant produced no evidence that she was constructively discharged. Rather, they assert that all of the evidence demonstrates that appellant retired because of her back injury.

---

[5] Appellant also references a potential error for failing to instruct the jury on constructive discharge but does not develop that argument in her brief, thus we will not consider it.

{¶ 155} The concept of constructive discharge applies where an employee demonstrates that his or her decision to end the employment was involuntary. *Mauzy v. Kelly Servs., Inc.*, 75 Ohio St.3d 578, 588, 664 N.E.2d 1272 (1996). "Courts generally apply an objective test in determining when an employee was constructively discharged, *viz.*, whether the employer's actions made working conditions so intolerable that a reasonable person under the circumstances would have felt compelled to resign." *Id.* at 588-589. The Ohio Supreme Court in *Mauzy* further explained:

> In applying this test, courts seek to determine whether the cumulative effect of the employer's actions would make a reasonable person believe that termination was imminent. They recognize that there is no sound reason to compel an employee to struggle with the inevitable simply to attain the "discharge" label. No single factor is determinative. Instead, a myriad of factors are considered, including reductions in sales territory, poor performance evaluations, criticism in front of coemployees, inquiries about retirement intentions, and expressions of preference for employees outside the protected group.

*Id.* at 589. In *Mauzy*, the court held that a genuine issue of material fact existed over whether Mauzy was constructively discharged on account of her age. *Id.* The court's conclusion was based on the factual record before it, and did not include any expert testimony as to the reason for Mauzy's decision to end her employment.

92.

{¶ 156} In this case, like *Mauzy*, there is evidence in the record to support a conclusion that appellees made the working conditions so intolerable that a reasonable person would have felt compelled to resign. Appellant testified to a number of incidents that could be viewed as undermining her authority, making her life difficult, and limiting her supervisory responsibilities. Further, after she was reinstated to work following arbitration, she was not returned to her position as captain of the Fire Prevention Bureau or to a position of similar status. She was also denied the opportunity to apply for a position as a battalion chief. Appellant was then told that she would be removed from payroll because she had exhausted her time on limited duty. Appellant testified that she then applied for disability because she had no other options at the Fire Department. Appellant presented at least some evidence that all of this was because of gender discrimination or was retaliation for her opposition to what she reasonably believed was gender discrimination. While we acknowledge that there is competing evidence that appellant retired on disability because of her back injury, we find that a reasonable person could conclude that appellant was constructively discharged.

{¶ 157} Therefore, we hold that the trial court erred in preventing appellant from presenting James Matthews as a witness, and as we found relative to the excluded exhibits, the trial court's error deprived appellant of her right to a fair trial.

{¶ 158} Accordingly, appellant's fourth assignment of error is well-taken.

93.

### E. Subsequent Remedial Measures

{¶ 159} Finally, in her fifth assignment of error, appellant argues that the trial court erred when it allowed appellees to solicit testimony as to the current number of women in the Fire Department in 2019. Appellant asserts that such testimony is inappropriate subsequent remedial measures testimony, is irrelevant under Evid.R. 402, and is unduly prejudicial. Appellees respond that the testimony is not evidence of a subsequent remedial measure, and that it was simply a question regarding the makeup of the fire department.

{¶ 160} Whether or not the testimony constitutes a subsequent remedial measure, we agree with appellant that the testimony was irrelevant. Evid.R. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Here, the makeup of the Fire Department in 2019 has no bearing on whether appellant was subjected to gender discrimination or retaliation between 1999 and 2008. Thus, the testimony regarding the number of women at the Fire Department in 2019 should not have been admitted. *See* Evid.R. 402 ("Evidence which is not relevant is not admissible.").

{¶ 161} The trial court permitted appellees to elicit evidence regarding staffing in 2019 while limiting appellant to evidence within the time frame of her complaint. As argued by appellant, the 2019 data was elicited to demonstrate selected, favorable

94.

evidence for appellees, irrelevant to the claims on trial. Even admissible evidence must be excluded if the "danger of unfair prejudice, of confusion of the issues, or of misleading the jury" would outweigh any probative value of the evidence. The irrelevant evidence admitted by the trial court was unduly prejudicial, with little to no probative value weighing in favor of admission. *See* Evid.R. 403(A). Accordingly, appellant's fifth assignment of error is well-taken.

### IV. Conclusion

{¶ 162} The claims in this case have been litigated for a torturously long time, and it gives us no joy to provide another forum for the harsh feelings and vitriol evident between counsel for appellant, counsel for appellees, and the trial court. Nevertheless, it is clear to us that appellant's attempts to prove her case were frustrated at every turn, and justice requires that she be given a fair opportunity to present her claims, whatever their merits.

{¶ 163} In sum, we find that substantial justice has not been done the party complaining, and the judgment of the Lucas County Court of Common Pleas is reversed. The matter is remanded to the trial court for further proceedings consistent with this decision. Appellees are ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment reversed,
and remanded.

95.

Capt. Carla Stachura, et al.
v. City of Toledo
Case No. L-19-1269

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Mark L. Pietrykowski, J.                  _____
                                                       JUDGE

Thomas J. Osowik, J. _____

Gene A. Zmuda, J. _____                 _____
CONCUR.                                                   JUDGE


_____
                                                       JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.